Filed 3/20/25  P. v. Juarez CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>JOSE ARMANDO JUAREZ,<br><br>  Defendant and Appellant. | H050476<br>(Monterey County<br> Super. Ct. No. 19CR000943) |
| THE PEOPLE,<br><br>  Plaintiff and Respondent,<br><br>  v.<br><br>EDUARDO ANAYA SOLIS,<br><br>  Defendant and Appellant. | H050556<br>(Monterey County<br> Super. Ct. No. 19CR000944) |

Defendants Jose Armando Juarez and Eduardo Anaya Solis appeal after a jury found them guilty of first degree murder and other crimes related to a killing in which Juarez supplied the guns and Solis fired at a young man on a street in Greenfield.  The trial court sentenced Juarez to 25 years to life in prison plus a determinate term of five years eight months.  The court sentenced Solis to 25 years to life in prison consecutive to a 20-year firearm enhancement and a determinate term of five years and eight months.

On appeal, Juarez and Solis raise multiple claims of error. Stated broadly, they separately or jointly challenge various aspects of the jury instructions, the denial of a severance motion, the trial court's admission of evidence, the sufficiency of the evidence, the effectiveness of defense counsel, the trial court's alleged bias against the defense, the presentation of false evidence, and the cumulative prejudice of the alleged errors.

For the reasons explained below, we affirm the judgments against Juarez and Solis but direct the trial court to correct an error in Solis's abstract of judgment.

## I. FACTS AND PROCEDURAL BACKGROUND

A. *Procedural History*

In May 2022, the Monterey County District Attorney filed a first amended information (information) charging Juarez and Solis with the willful, deliberate, and premeditated murder of Charles Jose (Pen. Code,[1] § 187, subd. (a); count 1), two counts of shooting at an inhabited dwelling (§ 246; counts 2 & 3), and conspiracy to commit murder (§ 182, subd. (a)(1); count 4). Counts 1, 2, and 3 each included a gang enhancement allegation as to both Juarez and Solis (§ 186.22, subd. (b)(1)). Additionally, count 1 included two firearm enhancement allegations as to Solis (under §§ 12022.5, subd. (a) & 12022.53, subd. (c), respectively), a firearm enhancement allegation as to both Juarez and Solis (§ 12022.53, subd. (d)), and a firearm enhancement allegation as to an unnamed "principal" (§ 12022.53, subds. (b), (d), (e)).[2]

In June 2022, the jury found Juarez and Solis guilty of first degree murder (count 1), two counts of shooting at an occupied dwelling (counts 2 & 3), and conspiracy to commit murder (count 4). Further, the jury found true the allegation that Solis personally discharged a firearm (§ 12022.53, subd. (c)) but found not true the allegation that Solis personally discharged a firearm causing death (§ 12022.53, subd. (d)).

---

[1] All further unspecified statutory references are to the Penal Code.
[2] Upon the district attorney's motion at trial, the trial court dismissed the firearm enhancement alleged under section 12022.5, subdivision (a) as to Solis alone.

2

After the jury returned its verdicts, the district attorney orally amended the information to add count 5 charging Juarez and Solis with active participation in a criminal street gang (§ 186.22, subd. (a); count 5). Juarez and Solis each pleaded no contest to that count in exchange for dismissal of the remaining gang and firearm enhancement allegations.

In September 2022, the trial court held sentencing hearings for Juarez and Solis. The trial court sentenced Juarez to an indeterminate term of 25 years to life consecutive to a determinate term of five years and eight months as follows: 25 years to life on count 1 (first degree murder), five years (the middle term) on count 2 (shooting at an inhabited dwelling) to be served consecutively, five years on count 3 (shooting at an inhabited dwelling) to be served concurrently, 25 years to life on count 4 (conspiracy to commit murder) to be served concurrently, and eight months (one-third the middle term) on count 5 (participation in a criminal street gang) to be served consecutively.[3]

The trial court sentenced Solis to an indeterminate term of 25 years to life enhanced by 20 years, consecutive to a determinate term of five years and eight months as follows: 25 years to life on count 1 (first degree murder) plus 20 years for the attendant firearm enhancement (§ 12022.53, subd. (c)) to be served consecutively, five years (the middle term) on count 2 (shooting at an inhabited dwelling) to be served consecutively, five years on count 3 (shooting at an inhabited dwelling) to be served concurrently,[4] 25 years to life on count 4 (conspiracy to commit murder) to be served

---

[3] Although not mentioned orally on the record at Juarez's sentencing hearing, according to the minute order, the trial court struck the remaining enhancement allegations.

[4] The reporter's transcript indicates that, when sentencing Solis, the trial court said "[a]s to [c]ount 3" twice as it pronounced the five-year terms, but it failed to mention count 2. Nevertheless, the minute order for the sentencing hearing and the abstract of judgment state separate terms for count 2 and count 3 (as described herein). Solis did not object when the trial court imposed his sentence, and he makes no argument in his appellate briefing about the terms imposed on counts 2 and 3. Under these

3

concurrently, and eight months (one-third the middle term) on count 5 (participation in a criminal street gang) to be served consecutively.[5]

B. *Evidence Presented at Trial*

1. <u>Prosecution Evidence</u>

Angel S. (Angel) was 16 years old at the time of the present offense in January 2019.[6]  Angel testified that he met and became friends with Solis (who was a couple of years older than Angel) when they were young.  Solis educated Angel about gangs in King City and was affiliated with a Sureño gang called Mexican Klan Locos (MKL).  Angel began associating with Sureños when he was in high school and by mid-2018, Angel was interested in becoming a Sureño.  In August 2018, Angel was expelled from high school after threatening a fellow student who associated with Norteños.

In December 2018, Solis asked Angel for a ride from King City to Marina.  Angel drove Solis and their cousin (Axel) to Marina to pick up a gun from a person called "Spanky" (whom the police considered an active high-level Sureño gang member).  At Spanky's home, Spanky gave Solis a MAC-10 gun with a silencer.  Angel, Solis, and Axel returned to King City with the gun and fired it in the "back roads" of town.  Thereafter, Solis asked Angel to drive to Juarez's house.[7]  Solis entered Juarez's house with the gun and then returned to Angel's truck without it.

---

circumstances, we presume the trial court merely misspoke at Solis's sentencing hearing and intended to impose the terms stated in the minute order and the abstract of judgment on counts 2 and 3.

[5] Although not mentioned orally on the record at Solis's sentencing hearing, according to the minute order, the trial court struck the remaining enhancement allegations.

[6] Angel testified against Juarez and Solis under a cooperation agreement with the district attorney.  We refer to Angel and others by either their first name and last initial or first name to protect their privacy interests.  (See Cal. Rules of Court, rule 8.90(b)(10).)

[7] Juarez was 21 years old at the time of the present offense.

Prior to the date of the present offense (January 13, 2019[8]), Solis asked Angel if he was " 'down to drop a body' " (i.e., willing to kill someone). In addition, Solis and Angel traveled to Greenfield with the MAC-10 gun looking for someone to shoot. Angel considered shooting someone because he "always wanted to fit in or [] be cool in a way. And [he] wanted to [] prove it." Angel viewed "dropping a body" as "putting in work"— that is, committing crime for the gang's benefit and to "rank up in the gang."[9]

On January 12, Solis asked Angel about his availability to go to Greenfield (the homebase of the Tiny Locos Norteños gang) or Soledad (a predominately Norteño town) "[t]o put in work, commit crime." Angel was not able to accompany Solis that day.

The next day (January 13), Angel exchanged text messages with Solis, and they planned a trip to Greenfield or Soledad to "put in work" by "kill[ing] someone, a Norteño." That afternoon, Angel picked up Solis in Angel's father's white truck. Solis directed Angel to drive to the house of a Sureño gang member. There, they met up with a person identified at trial as Brayan Urrutia-Flores.[10] Solis next directed Angel to drive to Juarez's house. Solis, Angel, and Urrutia-Flores entered Juarez's garage and Juarez gave them three loaded guns from a Nike box—the MAC-10 for Solis, a large handgun for Urrutia-Flores, and a smaller handgun for Angel. Juarez also gave them a red bandana and, to Urrutia-Flores, a green hat.

Juarez and the group got into the white truck, and Juarez drove them to a gas station to purchase gasoline because the truck's fuel level was low. Next, Juarez drove the group to meet up with a person identified at trial as Luis ("Luigi") Sarabia, whom Angel knew to be a Sureño gang member. Juarez asked Sarabia "if he was ready." Sarabia asked " 'for what,' " and Juarez replied " 'to put in work.' " Sarabia said " 'no' "

---

[8] Unless otherwise indicated, all dates were in 2019.

[9] A detective similarly testified that the phrase " 'put in work' " refers to a gang member or a person who wants to become a member doing things for the gang's benefit to show loyalty to the gang.

[10] The record indicates that Urrutia-Flores was about the same age as Angel.

because he did not have a gun on him.  Juarez "knocked him for that."  Sarabia asked if he should " 'go get it,' " and Juarez "told him no."  Sarabia hopped into the truck.  Juarez drove the group to his house and exited the truck.[11]

Sarabia took over the driving of the white truck and drove the group (not including Juarez, who had left the group) to Greenfield.[12]  According to Angel, everyone in the truck at this point was aware of the plan "to do a shooting."  Angel explained, "There was no specific place of where to go [in Greenfield].  [] [W]e were just going to drive around, see if we saw someone."

Eventually, the group spotted a man wearing red shorts and washing his car (victim Jose).  When Solis asked if anyone knew Jose, Urrutia-Flores identified Jose as a "wannabe" gang member.  Thereafter, Solis spoke to Juarez by phone, and they discussed "where [the group in the truck] had seen [a] Norteño" and where Juarez "had seen Norteños."  The group drove to a Valero gas station in Greenfield and met with Juarez (who had driven there in a green van with a white hood).  Juarez jogged up to Solis (as Solis sat in the truck) and shook Solis's hand.  Juarez told the group about "two Norteños that he had spotted," including the man who was washing his car and "a group of Norteños" who "were burning out tire."  The group discussed "how it was easier to get the person washing his car."  Sarabia drove the group away from the gas station, followed by Juarez's green and white van.

As the group in the white truck traveled back toward Jose's location (on Seventh Street), in preparation for the shooting, Solis held the MAC-10, Angel held the large handgun, and Urrutia-Flores held the smaller handgun.  Sarabia stopped the truck near Jose's car.  Solis and Urrutia-Flores exited the truck and began shooting.  Jose "looked

---

[11] Angel believed that Juarez, Sarabia, and Urrutia-Flores were associated with a Sureño gang called Esperanza (ESPE).

[12] Angel testified Sarabia had a driver's license and that was the "main reason why he was driving."  However, the parties stipulated at trial that Sarabia did not have a driver's license.

6

scared and he tried to run." He tripped and fell to the ground. Solis ran up to Jose and shot him as he lay on the ground.[13]

After shooting at Jose, Urrutia-Flores and Solis returned to the truck. Angel testified that Solis got back in the front passenger seat.[14] Sarabia told Angel that " '[n]ext time' " they would be the ones to get out of the truck. Sarabia drove the truck away from the scene "a little fast." The group traveled back toward Juarez's house in King City. On the drive back to King City, Angel saw Juarez's green and white van following the group.[15]

The group arrived at Juarez's house and waited for him. Juarez arrived a few minutes later with four, 40-ounce Mickey's beers that he had purchased on his way home from Greenfield. Inside Juarez's garage, the group returned the guns to Juarez and drank the beer he gave them. According to Angel, Juarez exhibited "a mix of emotions of happiness, like excitement and like . . . reassurance of what we had just did [*sic*], like happiness. Like, yeah." Solis and Urrutia-Flores washed their faces and hands to remove "the gun residue." Angel similarly cleaned the white truck with a rag and water.

The next day (January 14), the police searched Angel's home, took Angel into custody, and interviewed him. During the interview, after speaking with his father and mother, Angel decided to cooperate with the police. Angel recounted to the police the

---

[13] The police found 24 spent cartridge cases at the crime scene, comprising 17 .45-caliber casings and seven nine-millimeter casings. The police also discovered bullet strikes in two nearby houses. An autopsy performed on Jose's body revealed six gunshot wounds, including a penetrating gunshot wound to Jose's head which caused his death.

[14] An eyewitness similarly testified about seeing some people "scrambling" into a white truck. When recalled during Juarez's defense case, the eyewitness said that she did not remember telling an investigator that she had seen two males getting into the backseat of the truck. However, the investigator testified that the eyewitness had reported seeing "two males scrambling to get into the back passenger compartment of a white" truck.

[15] The parties stipulated that a surveillance camera near the crime scene recorded the white truck driving near the crime scene around the time of the shooting but not Juarez's van. The prosecution's evidence did not establish the exact location of Juarez's van at the time of the shooting.

events surrounding the shooting, including the involvement of others. He told the police that during the crime, he " 'didn't do anything' " and " 'was just sitting in the car.' " He also said, " 'I'm not going to lie to you. I had a strap [(i.e., gun)] too.' " The police released Angel, who thereafter assisted the police in their investigation.

Between January 15 and January 24, with guidance from the police, Angel recorded several pretext phone calls that he had with Solis (certain excerpts of which the prosecution played for the jury).

On January 24, the police again took Angel into custody. In February, Angel entered into a cooperation agreement with the district attorney. Angel admitted committing conspiracy to commit murder and conspiracy to commit street terrorism, with the former charge to be dismissed upon the conclusion of his cooperation and the latter charge to result in a sentence selected by a judge. The agreement called for Angel to provide truthful testimony about the crime. Angel was released from custody, and he and his family were relocated and given remuneration.

Police arrested Solis and Juarez on January 24. Greenfield Police Department Detective Leonel Guzman interviewed Solis that day (and the prosecution played a recording of the interview for the jury). During the interview, Detective Guzman learned no new facts about the crime from Solis and falsely told Solis that the shooting had been captured on video. When searching Solis's residence, the police found a blue rag and a hat with "X111" on it.

During their investigation, the police seized several cell phones associated with the suspects and extracted data from the phones. The extracted data included texts and other messages exchanged in the days after the crime between phones and accounts associated with Urrutia-Flores, Solis, and Juarez. In text messages between Urrutia-Flores and Solis on January 18, Solis stated that he was " 'out of town' " and did not know when he would return. In addition, data extracted from Urrutia-Flores's phone indicated that that phone was used to search and browse the Internet for information related to the present offense.

8

Urrutia-Flores's phone also was used to make calls on January 18 to numbers in the 714 area code (Orange County).

A phone associated with Juarez made eight calls between January 15 and January 23 to a phone associated with Solis and multiple calls to a contact listed as "Tio Jaime" and other phone numbers with a 714 area code. Juarez's phone also exchanged text messages with phones associated with Urrutia-Flores and Solis and a telephone number for a person called "Big Chino." The text messages between Juarez and Big Chino included a message on January 17 in which Juarez asked Big Chino if he could " 'pick up a toy' " from within a trash can outside of Juarez's house.[16] Additionally, photos extracted from Juarez's phone included photos taken on January 19 of an Orange County Sheriff's Department Humvee vehicle and photos from June 2018 depicting a cardboard box containing a shotgun, a Glock handgun, and multiple cartridge shells for a shotgun.

A phone associated with Sarabia exchanged text messages and calls with Juarez's phone. Sarabia's phone also contained a selfie photo of Sarabia with the letters "ESPE" written on it, a photo taken on January 18 in Santa Ana, and a photo of an Orange County Sheriff's Department Humvee that looked like the one found in the photos on Juarez's phone.

King City Police Department Detective Joshue Partida testified as an expert in criminal street gangs, "able to render an opinion regarding whether someone is a member of a criminal street gang or not." Detective Partida explained that King City had three Sureño gangs: MKL, La Esperanza Trece (LET or ESPE), and Dukes. Sureños are overseen by the Mexican Mafia prison gang and associate with the color blue and number 13. King City's Sureño gangs frequently committed crimes together. The Sureños are rivals of the Nuestra Familia prison gang and Norteños, who associate with the color red and number 14. King City had one Norteño gang (SAG), and Greenfield had several

---

[16] A detective testified that "toy" is a slang term for a gun.

9

Norteño gangs, including the Tiny Locos (TLS). Sureños and Norteños in southern Monterey County frequently targeted one another for murder. Sureños showed their disrespect for Norteños by displaying a broken star symbol and the acronym NK (Norteño killer).

By February 2018, Juarez had a broken falling star with bullet holes in it tattooed on his arm. At the time of trial, Solis had MKL and the Roman numeral 13 tattooed on his face, and NK tattooed on his throat. In Detective Partida's opinion, Juarez, Solis, Urrutia-Flores, and Sarabia were all active Sureño gang members on the date of the present offense.

On cross-examination, Detective Partida conceded that his opinion about Juarez being an active gang member was based solely on Juarez's "involvement with the commission of the homicide." Partida also acknowledged that it is not illegal to be a member of a gang.

### 2. Defense Evidence

Solis did not present any evidence at trial.

Juarez testified in his own defense and presented the testimony of five witnesses.

Juarez testified that he moved to King City from Mexico when he was about eight years old. After graduating from high school at age 17, he worked in the fields and packing. At age 19, he married and has a stepdaughter and young son. Juarez sold drugs—in amounts ranging from "[l]ittle baggies" to "maybe half pounds"—to supplement his family's income.

While growing up, Juarez's friends "became southsiders" and "they kind of led [him] that way too." Juarez was initiated ("jumped") into the La Esperanza Trece gang at age 13 or 14. He got into fights with Norteño gang members and wannabe Norteños. He received his broken falling star tattoo at age 16. He "didn't really like" Norteños and thought the tattoo "would look cool." Around age 16, Juarez shifted away from the gang and focused on graduating from high school. Most of his gang friends moved away, and

10

some had been imprisoned or killed. Juarez never dropped out of the gang, but he chose not to be active in the gang. After choosing to no longer be an active member, Juarez did not cover his tattoo because he "wouldn't want [gang members] thinking wrong of [him]."

By January 2019, Juarez and one other person were "pretty much" the only ones left in the La Esperanza Trece gang. Juarez explained that they did not get along with MKL because one of Juarez's friends "was found dead in Sureño territory." Juarez further testified that he sometimes did favors for MKL, but he was not part of their gang. Juarez explained that if an active gang member or gang aspirant asks him to "hold a gun," he "normally" would not "really have a choice" to say no.

In December 2018, Solis and Angel brought the MAC-10 gun to Juarez. Solis asked Juarez to do him a favor and hold on to the gun for an unspecified period. Juarez agreed. Juarez "thought [Solis] was MKL" and knew him as a drug customer who sometimes bought marijuana and cocaine. Regarding Angel, Juarez knew of him but "never really knew [Angel] to the point where" they were close. Juarez put the MAC-10 gun (and its magazine) in a Nike box and stored the box in his closet. Solis told Juarez that he (Solis) would pick up the gun if he needed it.

On January 13, Solis, Angel, and Urrutia-Flores went to Juarez's house. Solis asked for the gun. Juarez retrieved the Nike box (containing only the MAC-10 gun) and handed it to Angel. Juarez did not hand over two additional handguns, a bandana, or a hat. Juarez also did not ask the group what they intended to do with the MAC-10.

Urrutia-Flores asked Juarez if he had any marijuana, and Juarez sold him $10 worth of the drug. Juarez then accepted the group's invitation to go cruising in Angel's truck and get high. They asked if Juarez had a driver's license and wanted to drive. Juarez said he did and agreed to drive. Angel asked who was going to pitch in for gas. No one else had money so Juarez drove to the gas station and bought $10 or $15 of gas. As Juarez drove them around King City, they ran into Juarez's good friend, Sarabia,

11

whom they invited to join them to "cruise around." Juarez did not ask Sarabia if he had a gun and did not get upset with Sarabia.

As Juarez drove further, "Angel said, 'Let's go mob [(i.e., cruising)] in Greenfield.' " Juarez "got kind of worried" and "just started thinking about" the risk of going to Greenfield in a group. He "didn't want to be part of whatever . . . they want[ed] to go do in Greenfield, or what was the reason [*sic*] to go to Greenfield." Juarez "didn't tell [the group] anything." He "just started telling them excuses that [he] had things to do." He slowly drove back to his house. When he got close to his home, he parked the truck and told the group, "I'm good, . . . I don't want to be part of whatever you guys thinking [*sic*]." Juarez testified further, "So pretty much I just withdrew from whatever their plans or whatever plans they had to do in Greenfield."

Juarez exited the truck and "kind of power walked inside of [his] house." Upon entering the house, Juarez's mother-in-law asked him if he could take some items to her elderly mother in Greenfield (which was not an unusual errand). Five or 10 minutes after Juarez returned home, he received a text message from Solis asking if Juarez had $20 of cocaine. Juarez then left home, driving his van to Greenfield to drop the items off at his wife's grandmother's residence on Ninth Street. Juarez called Solis to find out if he still wanted the cocaine. Juarez and Solis learned that they were both in Greenfield, and Solis suggested they meet up at a Valero gas station. Juarez drove to the gas station, parked at one of the pumps, jogged over to Angel's truck, and handed the cocaine to Solis. There was no discussion about a person wearing red shorts or about the group returning to Juarez's house.

After the drug exchange, Juarez exited the gas station, drove along Apple Avenue, turned right on Fifth Street, proceeded to Highway 101 south, and returned home—stopping first at a mini mart to buy some beer.

When Juarez got back home, Angel's truck was parked outside his house. Juarez thought this was "weird" and was surprised they were there. Juarez noticed Angel and

12

Sarabia standing next to the truck; Angel appeared to be looking for something in the truck. Juarez "told them, what's up" and walked to the side door of his house. There, he noticed Solis and Urrutia-Flores "in the door inside the garage." Juarez told them to wait a minute while he dropped his beer inside the house. After putting the beer away and speaking to his mother-in-law, Juarez went back outside to see what the group was doing. By that time, "the white truck was gone." Juarez entered his garage and asked Solis and Urrutia-Flores what they were doing. They replied that they were waiting for their ride. A few minutes later, a white car picked them up. A few hours after that, Juarez went back to his garage and saw the Nike box. He opened the box and saw that the MAC-10 gun was back inside it. He put the box on the shelf.

A couple of days later, Juarez learned from the news that a murder had occurred in Greenfield on the afternoon of January 13. He "started getting kind of worried" and suspected the group had killed someone with the gun that he had given them. Juarez decided to get rid of the gun. He "didn't want part of it, nothing to do with whatever happened that day to reflect back on [him] [*sic*]."

Juarez eventually asked Urrutia-Flores about what the group had "ended up doing" while they were in Greenfield. Urrutia-Flores did not tell him. Juarez also spoke with Solis between January 17 and 23. Juarez told Solis that he (Juarez) was going to get rid of the gun and would apprise Solis of its location if he wanted to know. Juarez did not ask Solis if he was involved in the Greenfield shooting because Juarez did not "want to possess that information. The less you know, the better." In addition, Juarez saw Sarabia but did not ask him about the shooting in Greenfield.

On January 17, to get rid of the gun, Juarez put the Nike box in a trash can and contacted Big Chino (a person with whom Juarez did business) to pick it up. After Big Chino confirmed that he had collected the gun, Juarez told him someone else would contact him for it. That night, Juarez left for Anaheim (Orange County) with Sarabia,

13

Urrutia-Flores, and another friend to visit Juarez's uncle and get more drugs. They stayed in Orange County for about two days before returning to King City.

Juarez explained that the photo on his phone of a cardboard box containing a shotgun and Glock handgun was taken seven or eight months before the present offense. The shotgun belonged to Juarez's wife, and the handgun belonged to a friend. Juarez did not give that handgun to anyone in the group on January 13. Juarez testified that he had no knowledge the group intended to kill someone, and he did not intend or agree to help kill a Norteño that day.

On cross-examination, Juarez admitted that he "didn't completely give" Detective Partida the full "story" when Partida interviewed him about the murder. Juarez admitted that during the interview, he lied about who had visited his house on January 13, denied that he had provided the MAC-10 gun, and omitted that he had gone to his wife's grandmother's home in Greenfield and then met up with Solis at the gas station. Juarez testified that he viewed Solis, Urrutia-Flores, Sarabia, and Angel as "[r]egular southsiders" and did not know whether they had been "jumped into" a Sureño gang.

Juarez's mother-in-law testified that on January 13, she asked Juarez to bring some items to her mother's home on Ninth Street in Greenfield. In addition, Juarez's wife testified that on January 13, she saw Juarez with a beer, and there were three other beers in their refrigerator.

Dr. Jesse De La Cruz testified for the defense as an expert on criminal street gangs. Dr. De La Cruz explained that his goal in testifying was to "educate" the jury about gangs because what law enforcement says "is tainted and it's inaccurate" and "[o]ne size doesn't fit all as to the crimes." Dr. De La Cruz described the Mexican Mafia and Nuestra Familia as "criminal organizations." By contrast, "street gangs or just haphazard individuals get together [*sic*], they commit chaos, some of them kill." Dr. De La Cruz opined that the "law enforcement ideology that gang members have to put in work" is inaccurate. He explained that street gang members (as compared to prison gang

14

members) "don't have to [put in work]. They do. But they don't have to. They choose to." Additionally, Dr. De La Cruz said there are no "shot callers" in street gangs. Rather, "[t]here are individuals . . . that have more influence than others, but they cannot and do not have the right to tell another member what to do. [] They can suggest, but they don't have to follow."

In response to hypothetical facts, Dr. De La Cruz opined that a gang member might be criminally inactive but not declare himself inactive to his gang if "there's nobody he can declare it to." Additionally, if such a gang member were asked to hold a gun by an "active gang member or somebody who is interested in actively coming up in the gang," the criminally inactive gang member would be unconcerned about breaking the law and would automatically "say 'all right.'" Further, Dr. De La Cruz believed that if such a gang member "doesn't hold the gun, there's no doubt . . . that eventually something is going to happen because he refused to do something for the gang."

Dr. De La Cruz explained that it would be "pretty normal" for a criminally inactive gang member to get into a vehicle with people he knows are carrying guns and not call the police if he had a suspicion that a shooting had been committed. It also would not be "surprising" that such a gang member would "omit the truth as to [his] part" in a shooting when interviewed by the police. "[H]e would be really a fool, based on the lifestyle that they live, to admit anything. Because as far as the hypothetical's concerned, he hasn't . . . done anything except give up the gun." If such a gang member were to give up the names of people involved, he would risk being labeled a snitch and shot or killed (or having his family harmed) and he could be sent to jail and assaulted.

## II. DISCUSSION

Juarez raises 14 claims of error. Solis raises four claims of error, three of which are joined with claims raised by Juarez. We address their claims in the order they are raised by Juarez, noting Solis's joinder.

15

A. *Failure to Instruct on " 'Criminal Street Gang' " and " 'Active Gang Membership' "*

Juarez contends the trial court prejudicially erred and violated his constitutional rights by failing to instruct the jurors on "the legal definitions of the terms 'criminal street gang' and 'active gang membership.' " (Capitalization & boldface omitted.)  He further asserts that the failure to define these terms reduced the prosecution's burden to prove specific intent, premeditation, and deliberation.  Solis joins Juarez's argument in full.

The Attorney General responds that the trial court correctly refrained from instructing with CALCRIM Nos. 1400 and 1401 on the elements of section 186.22, subdivisions (a) and (b)(1), because Juarez and Solis were not charged pretrial with the offense of active participation in a criminal street gang and were not tried on any gang enhancement allegations.  The Attorney General further contends that "freestanding gang evidence admitted for purposes other than proving charges and allegations under section 186.22 need not meet the definitions in that statute."[17]

1.  Additional Background

Pretrial, the trial court granted defense motions under section 1109 to bifurcate the trial of the gang enhancement allegations from the charged offenses and other allegations stated in the information.  Further, the court ruled that evidence concerning gangs was admissible in the prosecution's case-in-chief to show motive.  However, after considering defense arguments against the admission of gang evidence, the court precluded the prosecution from presenting any evidence of predicate offenses.  (See § 186.22, subd. (e)(1).)

---

[17] The Attorney General makes no argument that Juarez and Solis forfeited their claim of error by failing to ask the trial court to instruct on the definition of criminal street gang and active gang membership.  Given the Attorney General's failure to assert forfeiture, we assume arguendo that Juarez's and Solis's claim of error is properly raised for the first time on appeal.

16

During trial, Juarez's defense counsel stated that she did not "object[] to [Detective] Partida opining about [Juarez] being an active gang member." Counsel explained that the relevant issue was "whether or not [Juarez] is an active gang member. Because it's not against the law to be a gang member. It's only active gang members that go out and shoot rival gang members." Counsel added, "there's quite a distinction between a gang member and an active gang member. And the experts will absolutely testify to that difference."

As detailed *ante* (see pt. I.B.1.), the prosecution presented expert testimony from Detective Partida about criminal street gangs, focusing on Sureño and Norteño gangs in King City and Greenfield and opining on the gang status of Juarez, Solis, Urrutia-Flores, and Sarabia. Juarez presented testimony in his defense from Dr. De La Cruz, an expert on criminal street gangs. Unlike Detective Partida, Dr. De La Cruz answered a series of hypothetical questions (posed by Juarez's defense counsel) that asked Dr. De La Cruz to assume certain facts for the purpose of answering the questions. (See pt. I.B.2., *ante*.)

In the final jury instructions, the trial court instructed the jurors on their consideration of the expert witness testimony (using CALCRIM No. 332), including that the jurors had to "decide whether information on which the expert relied was true and accurate" and "whether an assumed fact has been proved." The court also instructed on the role of motive in deciding the case (using CALCRIM No. 370). Relatedly, without any defense objection or request for modification, the trial court instructed the jurors on the "limited purpose of evidence of gang activity" (boldface & capitalization omitted) (using CALCRIM No. 1403). The instruction read as follows: "You may consider evidence of gang activity only for the limited purpose of deciding whether: [¶] The defendant had a motive to commit the crimes charged. [¶] You may also consider this evidence when you evaluate the credibility or believability of a witness and when you consider the facts and information relied on by an expert in reaching his or her opinion. [¶] You may not consider this evidence for any other purpose. You may not conclude

17

from this evidence that the defendant is a person of bad character or that he has a disposition to commit a crime."

The trial court did not instruct with any part of CALCRIM Nos. 1400 and 1401, which set forth the elements of the offense of active participation in a criminal street gang (§ 186.22, subd. (a)) and the sentencing enhancement for committing a crime for the benefit of a criminal street gang (§ 186.22, subds. (b)(1), (d)).

### 2. Legal Principles

" 'In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case.' " (*People v. Townsel* (2016) 63 Cal.4th 25, 58 (*Townsel*).) "A trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal." (*People v. Lee* (2011) 51 Cal.4th 620, 638.)

"[A] claim that a court failed to properly instruct on the applicable principles of law is reviewed de novo. [Citation.] In conducting this review, we first ascertain the relevant law and then 'determine the meaning of the instructions in this regard.' [Citation.] [¶] The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law . . . .' [Citation.] ' "In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole . . . [and] assume that the jurors are intelligent persons and capable of understanding and correlating all jury instructions which are given. ["] [Citation.]' [Citation.] 'Instructions should be interpreted, if possible, so as to support the judgment rather than defeat it if they are reasonably susceptible to such interpretation.' " (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111–1112.)

### 3. Analysis

The word "gang" appears once in the jury instructions—in the phrase "evidence of gang activity" in the limiting instruction from CALCRIM No. 1403.

Juarez contends that "[w]ithout instruction on how the law defines key terms such as 'active gang member' and 'criminal street gang,' juries cannot begin to discern the validity of conflicting expert opinions and lay witness testimony about gangs and gang motives." Juarez further asserts that the omission of instructions defining those terms, as stated in CALCRIM Nos. 1400 and 1401, "left the jury without a way to measure the validity of the 'facts and information relied on by an expert witness in reaching his or her opinion.' [Citation.] Without those key instruction[s], the jury was never in the position to discern whether the 'assumed fact[s]' underlying the expert's opinions were 'true or correct.' "

We are not persuaded the trial court erred in failing to provide the jurors with definitions of the phrases "criminal street gang," and "active gang membership" or "active gang member" as stated in the CALCRIM instructions.

Neither Juarez nor Solis was tried for an alleged violation of subdivision (a) or subdivision (b)(1) of section 186.22. Hence, the prosecution was not required to prove, and the trial court was not required to instruct, on the definitions of a criminal street gang or active gang participation for the purpose of section 186.22.

Moreover, our Supreme Court has long recognized that "gang evidence, even if not admitted to prove a gang enhancement [under section 186.22], may still be relevant and admissible to prove other facts related to a crime." (*People v. Tran* (2022) 13 Cal.5th 1169, 1208 (*Tran*); see *People v. Ramirez* (2022) 13 Cal.5th 997, 1095 (*Ramirez*).) "Evidence of the defendant's gang affiliation—including evidence of the gang's territory, membership, signs, symbols, beliefs and practices, criminal enterprises, rivalries, and the like—can help prove identity, motive, modus operandi, specific intent, means of applying force or fear, or other issues pertinent to guilt of the charged crime." (*People v.*

19

*Hernandez* (2004) 33 Cal.4th 1040, 1049 (*Hernandez*).) Relatedly, California appellate courts have held that CALCRIM No. 1403 is relevant and appropriate for use when gang evidence is introduced concerning motive and credibility. (*People v. Samaniego* (2009) 172 Cal.App.4th 1148, 1168–1169; see *People v. Kaihea* (2021) 70 Cal.App.5th 257, 265–266; see also *People v. Chhoun* (2021) 11 Cal.5th 1, 34, fn. 15 [noting that "an instruction explaining the limited purpose for which gang evidence has been admitted, such as CALCRIM No. 1403, is generally advisable"].)

Effective January 1, 2022, Assembly Bill No. 333 (2021–2022 Reg. Sess.) (Assembly Bill 333) amended "section 186.22 by imposing new substantive requirements relating to gang enhancements and the criminal offense of gang participation." (*People v. Burgos* (2024) 16 Cal.5th 1, 7 (*Burgos*); see *People v. Clark* (2024) 15 Cal.5th 743, 752– 753 [describing the changes made to section 186.22].) Assembly Bill 333 also "added section 1109, which provides that, if requested by the defense, a trial court must try a gang enhancement charge separately from the underlying offense" and "that gang-participation offenses must be tried separately from all other counts that do not require gang evidence as an element of the crime." (*Burgos*, at p. 7.)

Nevertheless, as one Court of Appeal has explained, "nothing in Assembly Bill 333 limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*People v. Ramos* (2022) 77 Cal.App.5th 1116, 1132 (*Ramos*), disapproved on other grounds as stated in *Burgos*, *supra*, 16 Cal.5th at p. 31; see also *People v. Garcia* (2024) 107 Cal.App.5th 1040, 1049 (*Garcia*) ["[S]ection 1109 does not disturb existing case law holding that gang evidence may be admitted to prove substantive crimes."].) When enacting Assembly Bill 333, the Legislature did not purport to impose section 186.22's definitions of a criminal street gang or active gang participation in any other context. (See Stats. 2021, ch. 699, § 2.) As such, the changes effected by Assembly Bill 333 do not impose a duty on a trial court to

define criminal street gang or active gang participation in accordance with section 186.22 whenever gang evidence is admitted at trial.

Juarez relies on *People v. Lopez* (1998) 66 Cal.App.4th 615 (*Lopez*) to argue that "the word 'gang' falls into the category of 'undefined facially standardless language' which must be further defined to give it 'a constitutionally sufficient concreteness.' " In *Lopez*, the Court of Appeal agreed with the defendant that "the word 'gang' in [his probation] condition . . . is, on its face, uncertain in meaning." (*Id*. at p. 631.) The *Lopez* court explained that the word " 'gang' " as used in the probation condition (which prohibited the defendant's involvement in gang activities or association with gang members) "contemplates precisely the sort of criminally oriented association described in subdivisions (e) and (f) of section 186.22." (*Id*. at p. 634.) Thus, the appellate court "believe[d] it appropriate to order modification of the probation condition in issue so as to incorporate into it the definitions contained in subdivisions (e) and (f) of the statute." (*Ibid*.)

*Lopez* is inapposite to Juarez's and Solis's claim. The issue in *Lopez* concerned unconstitutional vagueness related to the word "gang" when used for the purpose of subjecting the defendant to revocation of probation. (See *Lopez*, *supra*, 66 Cal.App.4th at p. 630.) By contrast, the phrase "gang activity" in CALCRIM No. 1403—a limiting instruction—does not serve as an element that must itself be proved by the prosecution to subject a defendant to criminal liability, punishment, or revocation of liberty. Rather, when coupled with the words "evidence of," "gang activity" serves as a descriptor for the body of gang evidence presented by the prosecution and Juarez himself, the consideration of which is limited to determining "motive" and considering witness credibility and "the facts and information relied on by an expert witness in reaching his or her opinion."[18]

---

[18] "[M]otive is not an element. . . . Motive describes the reason a person chooses to commit a crime. The reason, however, is different than a required mental state such as

21

In short, neither "gang" nor "gang activity" was an element of any offense or sentencing enhancement considered by the jury, and the trial court's instruction under CALCRIM No. 1403 was legally correct. If Juarez and Solis believed that the words "gang" or "gang activity" needed further definition, they should have requested an explanation or clarification. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1012.) This imperative is especially acute here, where the trial court limited the scope of the admitted gang evidence in response to defense objections. If Juarez and Solis believed that the phrase "gang activity" in CALCRIM No. 1403 was synonymous with " 'criminal street gang' " and " 'active gang membership,' " stating so might have prompted the prosecution to seek permission to present additional gang evidence (including evidence of predicate offenses) that could have satisfied the elements of section 186.22—a circumstance that the defendants may well have sought to avoid.

Relatedly, the words "gang" and "gang activity," as used in the jury instructions, do not have technical legal meanings that required the trial court, sua sponte, to instruct on their meaning. Given the lack of any offense or sentencing enhancement under section 186.22, those words were used according to their common-sense meaning. As pertinent here, the dictionary definition of the word "gang" is "a group of persons working to unlawful or antisocial ends." (Merriam-Webster Dict. Online (2025) <https://www.merriam-webster.com/dictionary/gang> [as of March 14, 2025], archived at <https://perma.cc/6H3Z-WZFU>.) The word "activity" means "the quality or state of being active: behavior or actions of a particular kind. (Merriam-Webster Dict. Online (2025) <https://www.merriam-webster.com/dictionary/activity> [as of March 14, 2025], archived at <https://perma.cc/EK7M-44UH>.) " 'When a word or phrase " 'is commonly

---

intent or malice." (*People v. Hillhouse* (2002) 27 Cal.4th 469, 503–504, italics omitted; see also *People v. Scheer* (1998) 68 Cal.App.4th 1009, 1017–1018 ["Motive is an intermediate fact which may be probative of such ultimate issues as intent [citation], identity [citation], or commission of the criminal act itself."].)

22

understood by those familiar with the English language and is not used in a technical sense peculiar to the law, the court is not required to give an instruction as to its meaning in the absence of a request.' " [Citations.] A word or phrase having a technical, legal meaning requiring clarification by the court is one that has a definition that differs from its nonlegal meaning. [Citations.] . . . [T]erms are held to require clarification by the trial court when their statutory definition differs from the meaning that might be ascribed to the same terms in common parlance.' " (*People v. Smithey* (1999) 20 Cal.4th 936, 980, italics omitted.)

In the present case, the trial court instructed the jurors on their duty to "decide what the facts are" and apply the "ordinary, everyday meanings" to undefined words when deliberating the case. (CALCRIM No. 200.) The court also instructed jurors that they must use commonsense and experience in deciding whether testimony is "true and accurate." (CALCRIM No. 226.) These instructions provided the jurors with adequate guidance for discerning the "evidence of gang activity" that they could consider in making their determinations about motive, witness credibility, and the truth and accuracy of the facts and information relied on by an expert witness.

Given our conclusion that the words "gang" and "gang activity" have no specific statutory definition when used solely to describe gang evidence admitted for purposes unrelated to a violation of section 186.22, we decide that the jury instructions fully and fairly instructed on the applicable law and no instructional error occurred.

B. *Failure to Instruct on Withdrawal from Aiding and Abetting and the Conspiracy*

Juarez contends the trial court prejudicially erred and violated his constitutional rights by refusing to instruct on withdrawal as to aider and abettor liability and failing to instruct sua sponte on withdrawal from a conspiracy.

## 1. Additional Background

Pretrial, Juarez appears to have requested that the trial court instruct with CALCRIM No. 401 (aiding and abetting intended crimes), although the defense trial brief is not entirely clear on this point. There is no dispute that Juarez did not request an instruction under CALCRIM No. 420 (withdrawal from conspiracy).

When the parties and trial court discussed the jury instructions on the record during trial, Juarez's defense counsel noted that she had objected previously (at a prior, off-the-record conference) to the court's decision to forego instructing on withdrawal with respect to aiding and abetting. Counsel contended "there was substantial evidence of withdrawal based on [Juarez] driving the truck to his home, getting out and going into his home." The prosecutor responded that a defendant who withdraws "must do everything in their power to thwart the crime" and there was "zero evidence of crime thwarting" by Juarez.

In explaining its decision to forego the withdrawal instruction, the trial court noted that "the only evidence" regarding withdrawal was that Juarez "did not get into the [white] truck and indicated by his testimony that he was heading home." The court explained further: "So even that little evidence would be sufficient, from this [c]ourt's perspective, of substantial evidence of possible withdrawal, . . . so that is a reasonable inference the jury could find. [¶] However, reviewing the evidence in this case, I found no evidence, much less substantial evidence, supporting that he did everything reasonably within his power to prevent the crime from being committed. I saw no evidence whatsoever of any steps or any efforts of any kind to prevent the crime from being committed. [¶] So I found that there was insufficient evidence, much less substantial evidence to support that."

In accord with its ruling, the trial court did not include the optional language in CALCRIM No. 401 concerning withdrawal when instructing on aider and abettor

24

liability.[19]  The court also did not instruct the jurors with CALCRIM No. 420 regarding withdrawal from a conspiracy.  Further, although the trial court instructed on consideration of a coconspirator's statements (using CALCRIM No. 418) and the offense of conspiracy to commit murder (using CALCRIM No. 563), the court did not instruct the jurors on liability for a coconspirator's acts (CALCRIM No. 417).

### 2.  Legal Principles

A trial court's duty to instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case "extends to instructions on the defendant's theory of the case, 'including instructions "as to defenses ' "that the defendant is relying on . . ., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case." ' " ' " (*Townsel*, *supra*, 63 Cal.4th at p. 58; see also *People v. Barnett* (1998) 17 Cal.4th 1044, 1152.)

"[I]n a case involving general liability as an aider and abettor for [an] originally contemplated crime, a defendant will not be liable for the contemplated crime despite the fact that he aided, promoted, encouraged, or instigated the commission of the crime with the intent that it be committed, if he effectively withdraws from participation in the crime before it is committed." (*People v. Fiu* (2008) 165 Cal.App.4th 360, 384.)  Similarly, under a theory of liability premised on aiding and abetting under the natural and probable consequences doctrine, "a defendant will not be liable for crimes other than the

---

[19] The omitted language reads:  "A person who aids and abets a crime is not guilty of that crime if he or she withdraws before the crime is committed.  To withdraw, a person must do two things:  [¶]  1.  He or she must notify everyone else he or she knows is involved in the commission of the crime that he or she is no longer participating.  The notification must be made early enough to prevent the commission of the crime.  [¶] AND  [¶]  2.  He or she must do everything reasonably within his or her power to prevent the crime from being committed.  He or she does not have to actually prevent the crime. [¶]  The People have the burden of proving beyond a reasonable doubt that the defendant did not withdraw.  If the People have not met this burden, you may not find the defendant guilty under an aiding and abetting theory."  (CALCRIM No. 401.)

25

contemplated crime, even though they are the natural and probable consequence of that crime, if he effectively withdrew before the commission of those offenses. In each of these circumstances, withdrawal goes to the issue of whether or not the defendant was a participant in the offense at the time it was committed, and is not collateral to the elements of the offense." (*Ibid*.)

To be entitled to an instruction on withdrawal, "a defendant charged with aiding and abetting a crime must produce substantial evidence showing that (1) he notified the other principals known to him of his intention to withdraw from the commission of the intended crime or crimes, and (2) he did everything in his power to prevent the crime or crimes from being committed." (*People v. Shelmire* (2005) 130 Cal.App.4th 1044, 1055 (*Shelmire*); accord *People v. Richardson* (2008) 43 Cal.4th 959, 1022, superseded by statute on another ground as stated in *People v. Nieves* (2021) 11 Cal.5th 404, 509 (*Nieves*) [concluding that CALJIC No. 3.03—which conditions withdrawal on the defendant " 'doing everything in his power to prevent [the crime's] commission' "—"is a correct statement of the law"]; *People v. Fayed* (2020) 9 Cal.5th 147, 178–179 (*Fayed*).)

Regarding conspiracy, " '[g]enerally, a defendant's mere failure to continue previously active participation in a conspiracy is not enough to constitute withdrawal.' " (*People v. Lowery* (1988) 200 Cal.App.3d 1207, 1220.) However, " '[a] member of a conspiracy may effectively withdraw from it so as to exculpate himself from guilt for the future criminal acts of his coconspirators.' " (*People v. Sconce* (1991) 228 Cal.App.3d 693, 701 (*Sconce*).) "Withdrawal from a conspiracy requires 'an affirmative and bona fide rejection or repudiation of the conspiracy, communicated to the coconspirators.' " (*Ibid*., quoting *People v. Crosby* (1962) 58 Cal.2d 713, 730–731; see also *People v. Belmontes* (1988) 45 Cal.3d 744, 793, overruled on another ground by *People v. Cortez* (2016) 63 Cal.4th 101, 118 ["to withdraw from a conspiracy, one need only make an

26

affirmative repudiation communicated to his coconspirators."]; *People v. Jackson* (1996) 13 Cal.4th 1164, 1221 [citing *Belmontes* with approval].[20])

On appeal, "[w]e determine independently whether substantial evidence to support a defense existed." (*Shelmire*, *supra*, 130 Cal.App.4th at p. 1055; see also *People v. Manriquez* (2005) 37 Cal.4th 547, 581.)

### 3. Analysis

Juarez asserts that the trial "court's initial correct impulse to find substantial evidence supporting the withdrawal defense should have settled the question in favor of giving the [withdrawal] instruction. [Citation.] The court erred by substituting its view of the evidence of 'reasonableness' which was a question 'solely for the jury.' " The Attorney General responds that there was no substantial evidence to support instruction on withdrawal as to either aiding and abetting or conspiracy.

We agree with the Attorney General.[21] Regarding Juarez's liability as an aider and abettor, there was no evidence that Juarez did anything to prevent the charged offenses from being committed. By his own testimony, Juarez provided the MAC-10 gun to Solis, Angel, and Urrutia-Flores, picked up Sarabia to "cruise around," and then decided to drive himself home after Angel suggested that they go " 'mob' " (i.e., cruising) in

---

[20] By contrast, in *People v. Navarro* (2021) 12 Cal.5th 285, our Supreme Court said regarding conspiracy, "California law requires a withdrawing defendant to ' "notify[] the other party or parties of whom he had knowledge of his intention to withdraw from the commission of the crime *and . . .* [*do*] *everything in his power to prevent its commission.*" ' " (*Id*. at p. 307, italics added; accord *People v. Jones* (1961) 197 Cal.App.2d 503, 508 [discussing the failure to act to prevent the crime in the context of withdrawal from a conspiracy].) Neither Juarez nor the Attorney General cites *Navarro* or contends that, for the purpose of withdrawal from a conspiracy, the defendant must act to prevent the crime from being committed.

[21] Because the Attorney General does not assert forfeiture and we address the merits of Juarez's contention regarding instruction on withdrawal from a conspiracy, we need not address Juarez's alternative argument that his defense counsel provided ineffective assistance by failing to request instruction with CALCRIM No. 420.

27

Greenfield. When Juarez got to his home, Juarez told the group that he did not "want to be part of whatever [they were] thinking." He exited the truck and entered his home.

Juarez did not try to dissuade the group from going to Greenfield or alert authorities that an armed group of "[r]egular southsiders" was headed toward Greenfield—a town Juarez knew had Norteño residents. The trial evidence demonstrates that these potential courses of action were both available and reasonable under the circumstances, but Juarez failed to do anything. Further, under the prosecution's theory of the case, Juarez subsequently traveled to Greenfield in his own van, scouted around for a victim, and told the group in the truck about two Norteños he had spotted (including victim Jose).

On this record, we conclude there was no substantial evidence that Juarez did everything in his power to prevent the charged offenses from being committed and, thus, the trial court properly refused to instruct on withdrawal for the purpose of aider and abettor liability. (See *Shelmire*, *supra*, 130 Cal.App.4th at pp. 1055–1056; *Fayed*, *supra*, 9 Cal.5th at p. 180.)

Regarding Juarez's liability for a conspiracy to commit murder, as with aiding and abetting, Juarez's withdrawal from the conspiracy purportedly occurred when he drove the truck home, told the group he did not want to be part of "whatever" they were "thinking," and exited the truck. As noted *ante*, to effectively withdraw from a conspiracy, the defendant must truly and affirmatively repudiate the conspiracy and communicate that repudiation to the other members of the conspiracy.[22] (*Sconce*, *supra*, 228 Cal.App.3d at p. 701.)

---

[22] Given the parties' failure to address the *Navarro* court's articulation of a dual requirement for withdrawal from a conspiracy, we do not analyze whether the evidence demonstrates that Juarez did everything in his power to prevent the commission of the crime.

28

On the witness stand, Juarez denied that he knew the group intended to kill anyone. He also denied that he ever intended or agreed to help the group kill a Norteño. Given Juarez's claims about his innocent mindset and interactions with the group, we decide the evidence does not support the subjective component necessary for withdrawal from a conspiracy. According to Juarez, he never joined the conspiracy and knew nothing about the murder until he heard about it in the news a couple of days after it happened. Juarez's trial counsel never requested that the trial court instruct the jury on withdrawal from the conspiracy. Such a claim was inconsistent with Juarez's theory of the case at trial. Moreover, there was no substantial evidence supporting that, from Juarez's perspective, he communicated a true and affirmative rejection of an agreement, that included him, to kill a Norteño. "Conduct by a defendant after a purported withdrawal is relevant to whether the withdrawal was actually complete and in good faith." (*United States v. Bullis* (7th Cir. 1996) 77 F.3d 1553, 1562.) By his own admission, Juarez kept the MAC-10 gun after the group returned it, and he "decided to get rid of it" after hearing news about the killing. This behavior likewise undermines the assertion that Juarez truly and affirmatively repudiated a conspiracy when he drove home and separated from the group.

For these reasons we decide the trial court did not err in failing to instruct sua sponte on withdrawal from a conspiracy.

C. *Failure to Instruct Further on Causation*

Juarez contends the trial court prejudicially erred and violated his constitutional rights by failing to include language regarding proximate cause and intervening acts when instructing the jurors on the elements of murder using CALCRIM No. 520.

1. Additional Background

The trial court instructed the jurors that "[t]o prove that a defendant is guilty of [murder], the People must prove that: [¶] 1. The defendant committed an act that caused the death of another person [¶] AND [¶] 2. When the defendant acted, he had a state of

29

mind called malice aforethought." The parties agreed to the version of the instruction that was given, which did not include the optional language in CALCRIM No. 520 on proximate cause or multiple causes of death.

The omitted language on proximate cause reads as follows: "(An act/ [or] (A/a) failure to act) causes death if the death is the direct, natural, and probable consequence of the (act/ [or] failure to act) and the death would not have happened without the (act/ [or] failure to act). A natural and probable consequence is one that a reasonable person would know is likely to happen if nothing unusual intervenes. In deciding whether a consequence is natural and probable, consider all of the circumstances established by the evidence." (CALCRIM No. 520, italics omitted.)

The omitted language regarding multiple potential causes of death reads: "There may be more than one cause of death. (An act/ [or] (A/a) failure to act) causes death only if it is a substantial factor in causing the death. A substantial factor is more than a trivial or remote factor. However, it does not need to be the only factor that causes the death." (CALCRIM No. 520, italics omitted.)

In addition to instructing with CALCRIM No. 520, the trial court instructed the jurors on first degree murder (using CALCRIM No. 521), which stated that "[a] defendant acted with premeditation if he decided to kill before completing the acts that caused death." (Italics omitted.) The court also instructed the jurors on aiding and abetting principles (using CALCRIM Nos. 400 & 401).

　　2. Analysis

A trial court has a sua sponte duty to instruct on proximate cause only if causation is at issue. (*People v Bell* (2020) 48 Cal.App.5th 1, 17; *People v. Bernhardt* (1963) 222 Cal.App.2d 567, 590–591.) Similarly, in *People v. Jennings* (2010) 50 Cal.4th 616, our Supreme Court stated, "[a] concurrent-cause instruction is required when the evidence places at issue two or more causes of the result of the crime." (*Id.* at p. 670.)

30

Juarez asserts that if the jury believed his involvement was limited to handing over "one gun" (i.e., the MAC-10), "then the jury would need to decide if his act was a 'substantial factor in causing the death' of Mr. Jose or whether the actions of Angel's group were independent intervening acts." He further argues that "the failure to define 'cause of death' and the omission of instruction on 'interven[ing]' acts and 'substantial factors' meant that the jury was never told that it was required to find that Mr. Jose's death was the 'direct, natural and probable consequence' of a specific criminal act by [] Juarez. [Citation.] It was never required to determine whether the decision by Angel's group to head to Greenfield with a plan to 'do a shooting' [citation], was an intervening act which broke the chain of causation."

The Attorney General responds that causation was not at issue in this case because Juarez contended that although he handed over the MAC-10, he did not know the group's intention and, similarly, Solis contended that he was not a shooter and had no prior knowledge of the murder. Hence, from Juarez's and Solis's perspective, it did not matter which gun fired the shot that caused Jose's death. The Attorney General further asserts that regardless of any error in failing to instruct on proximate cause, such an error was harmless because Juarez was prosecuted as an aider and abettor of the murder and "[a]n aider and abettor to murder does not need to, and by definition does not, proximately cause the death of the victim. If he did, he would be a direct perpetrator."

Assuming arguendo that the trial court erred by failing to further explain the concept of causation for murder (i.e., "[t]he defendant committed an act that caused the death of another person"), we are convinced that any error in failing to provide such further instruction was harmless under either the state or federal standard of prejudice. (See *People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.)

The trial record clearly demonstrates that the prosecution sought a first degree murder conviction for Juarez based on a theory of direct aiding and abetting, not as a

direct perpetrator of the murder.[23]  The evidence presented did not suggest that Juarez was one of the shooters.  In accord with the evidence, the prosecutor argued to the jurors that "aiding and abetting is what we're talking about with everything that Defendant Juarez did in this case," and Juarez's defense counsel acknowledged in argument to the jury that Juarez was charged as "an aider and abettor."

Juarez's contentions regarding instruction on causation are belied by the interplay between murder law and aiding and abetting principles.  " 'Murder includes both actus reus and mens rea elements.  To satisfy the actus reus element of murder, an act of either the defendant *or an accomplice* must be the proximate cause of death.'  [Citation.]  Specifically, 'a "cause of the death of [the victim] is an act or omission that sets in motion a chain of events that produces as a direct, natural and probable consequence of the act or omission the death of [the decedent] and without which the death would not occur." [Citation.]  In general, "[p]roximate cause is clearly established where the act is directly connected with the resulting injury, with no intervening force operating." [Citation.]'  [Citation.]  An intervening force, in turn, 'is one which actively operates in producing harm to another after the actor's . . . act or omission has been committed.' "  (*People v. Carney* (2023) 14 Cal.5th 1130, 1137–1138, italics added; see also *id*. at pp. 1138–1139 [discussing concurrent causes].)

As for aiding and abetting, "[a] person who aids and abets the commission of a crime is culpable as a principal in that crime.  (§ 31.)  Aiding and abetting is not a separate offense but a form of derivative liability for the underlying crime."  (*People v. Gentile* (2020) 10 Cal.5th 830, 843 (*Gentile*), superseded by statute on another ground as stated in *People v. Wilson* (2023) 14 Cal.5th 839, 869.)  "[U]nder direct aiding and

_____

[23] " 'A defendant is a *direct* aider and abettor if " 'he or she, (i) with knowledge of the unlawful purpose of the perpetrator, (ii) and with the intent or purpose of committing, facilitating or encouraging commission of the crime, (iii) by act or advice, aids, promotes, encourages or instigates the commission of the crime.' " ' "  (*People v. Soto* (2020) 51 Cal.App.5th 1043, 1057.)

abetting principles, an accomplice is guilty of an offense perpetrated by another if the accomplice aids the commission of that offense with 'knowledge of the direct perpetrator's unlawful intent and [with] an intent to assist in achieving those unlawful ends.' " (*Gentile*, at p. 843.)

Our Supreme Court has "described the mental state required of an aider and abettor as 'different from the mental state necessary for conviction as the actual perpetrator.' [Citation.] The difference, however, does not mean that the mental state of an aider and abettor is less culpable than that of the actual perpetrator. On the contrary, outside of the natural and probable consequences doctrine, an aider and abettor's mental state must be at least that required of the direct perpetrator." (*People v. McCoy* (2001) 25 Cal.4th 1111, 1117–1118 (*McCoy*); see also *Gentile*, *supra*, 10 Cal.5th at p. 848 ["a direct aider and abettor to murder must possess malice aforethought"]; *People v. Curiel* (2023) 15 Cal.5th 433, 468; *People v. Chiu* (2014) 59 Cal.4th 155, 167, superseded by statute as stated in *People v. Lewis* (2021) 11 Cal.5th 952, 959, fn. 3.)

"Aider and abettor liability is thus vicarious only in the sense that the aider and abettor is liable for another's actions as well as that person's own actions. When a person 'chooses to become a part of the criminal activity of another, she says in essence, "your acts are my acts." ' " (*McCoy*, *supra*, 25 Cal.4th at p. 1118.) Hence, an aider and abettor (as compared to a direct perpetrator) can be liable for murder under a direct aiding and abetting theory even if only the direct perpetrator proximately caused the death. (See *People v. Pittman* (2023) 96 Cal.App.5th 400, 415 ["The direct aider and abettor must, therefore, act with intent to aid the life-endangering act of the direct perpetrator that proximately causes the death."]; *People v. Gonzales* (1970) 4 Cal.App.3d 593, 599 (*Gonzales*) [where the prosecution proved that one of three defendants killed the victim, "[t]hat is all that it was required to do to lay the foundation for proof of aiding and abetting on the part of all defendants similarly charged with the murder"].)

At Juarez's and Solis's trial, the trial court instructed the jurors that, for the purposes of aiding and abetting liability, the prosecution had to prove, inter alia, that "[t]he perpetrator committed the crime" (i.e., the murder). (CALCRIM No. 401.) Thus, to find Juarez guilty of murder, the jurors had to find that a person whom Juarez had aided and abetted in committing the murder "committed an act that caused the death of [Jose]" (as stated in the murder instruction). (CALCRIM No. 520.)

Under the evidence presented, the person whom Juarez aided and abetted could have been Solis or another member of the group who committed an act that proximately caused Jose's death. (See *Gonzales*, *supra*, 4 Cal.App.3d at p. 599; see also *People v. Bland* (2002) 28 Cal.4th 313, 337 ["A person can proximately cause a gunshot injury without personally firing the weapon that discharged the harm-inflicting bullet."].) Given the breadth of proximate causation, any further instruction on that concept in this case would not have benefitted Juarez. (See *Bland*, at p. 338 ["The correct definition of proximate causation is *broader*, not narrower, than jurors might assume."].)

Put differently, it does not matter for the purposes of Juarez's liability as an aider and abettor of murder whether the perpetrator who caused the death did so using the MAC-10 gun that Juarez admits he handed over or another weapon. Rather, if Juarez, with the requisite mental states, aided and abetted any member of the group who acted in a manner that caused Jose's death, Juarez is liable for first degree murder. The evidence supports this proposition.

Because we are convinced beyond a reasonable doubt that the jurors would have convicted Juarez of first degree murder had the trial court instructed further on causation, we conclude that any error in failing to instruct on causation as Juarez contends was harmless.

### D. *Instruction on Conspiracy to Commit Murder*

Juarez contends the trial court prejudicially erred and violated his constitutional rights by providing the jurors conflicting instructions on whether implied malice was an

34

acceptable mental state to prove the conspiracy to commit murder offense. Solis joins Juarez's argument in full and argues further that his defense counsel was constitutionally ineffective by failing to object to the conspiracy to commit murder instruction.

The Attorney General responds that there is no reasonable likelihood the jurors misunderstood the jury instructions as allowing them to convict Juarez or Solis of conspiracy to commit murder based on implied malice. The Attorney General further asserts that any error in the instruction was harmless beyond a reasonable doubt.[24]

      1.  Additional Background

Using CALCRIM No. 563, the trial court instructed the jurors on the charge of "conspiracy to commit *first degree murder*" (italics added), in pertinent part, as follows: "To prove that a defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant intended to agree and did agree with the other defendant or with Brayan Flores, Luis Sarabia, or Angel S[.] *to intentionally and unlawfully kill*; [¶] 2. At the time of the agreement, the defendant and one or more of the other alleged members of the conspiracy intended that one or more of them would *intentionally and unlawfully kill*; [¶] 3. One of the defendants, or Brayan Flores, Luis Sarabia, or Angel S[.] or all of them committed the following overt act alleged to accomplish the killing: [¶] . . . [¶] To decide whether a defendant and one or more of the other alleged members of the conspiracy *intended to commit murder in the first degree*, *please refer to Instructions 520 (First or Second Degree Murder With Malice Aforethought) and 521 (First Degree Murder), which define that crime*. [¶] When deciding whether a defendant and one or more of the other alleged members of the conspiracy *intended to commit murder in the first degree, do not consider*

---

[24] The Attorney General makes no argument that Juarez and Solis forfeited their claim of error by failing to object to the conspiracy to commit murder instruction at trial. Given the Attorney General's failure to assert forfeiture, we assume arguendo that Juarez's and Solis's claim of error is properly raised for the first time on appeal. Further, because we address the merits of this claim of error, we need not address Solis's alternative argument of ineffective assistance of counsel.

*implied malice. Conspiracy to commit murder requires an intent to kill.* [¶] The People must prove that the members of the alleged conspiracy had an agreement and intended to commit murder." (Italics added.)

Regarding murder, the instruction under CALCRIM No. 520 informed the jurors, in pertinent part, that "[t]here are two kinds of malice aforethought, express malice and implied malice. Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant had express malice if he unlawfully intended to kill. [¶] . . . [¶] If you decide that the defendant committed murder, it is murder of the second degree, unless the People have proved beyond a reasonable doubt that it is murder of the first degree as defined in Instruction 521." (Italics omitted.)

The instruction under CALCRIM No. 521 informed the jurors, in pertinent part: "A defendant is guilty of first degree murder if the People have proved that he acted willfully, deliberately, and with premeditation. [¶] . . . [¶] The requirements for second degree murder based on express or implied malice are explained in Instruction 520. [¶] The People have the burden of proving beyond a reasonable doubt that the killing was first degree murder rather than a lesser crime. If the People have not met this burden, you must find the defendant not guilty of first degree murder and the murder is second degree murder." (Italics omitted.)

When discussing the elements of the conspiracy offense in his closing argument, the prosecutor said the jurors could apply what they were told about murder. The prosecutor explained: "Did [the coconspirators] conspire to commit murder[?] *The only difference is there has to be that specific intent to kill, that express malice. It's not an implied malice count.* I just want to be precise on that. That is the one difference from murder. *So conspiracy to commit murder is that huddle with the specific intent to kill.*[25]

---

[25] Earlier in his argument, the prosecutor compared coconspirators to football players who huddle up and agree on their upcoming play.

36

*It's not the huddle to act with conscious disregard for life*. One little difference there. But the concept remains the same." (Italics added.)

Later in his closing argument, the prosecutor said, Juarez "acted with express malice. All those weapons, all those bullets. It's express malice. Certainly implied malice. Certainly. Been over, willful, deliberate and premeditated. . . . [¶] Now we're at first-degree murder, which we talked about, two elements. So this is the instruction you just got. So that the murder charge and the conspiracy which we talked about at length is part of the huddle, part of the planning, part of the legitimate huddle, the garage and Valero. That's what gets us to first-degree murder on the express malice, premeditated, willful, deliberate, premeditated theory. [¶] There's also the implied malice component, which was defined, because just the recklessness, the conscious disregard for human life by being part of this, supplying the guns. That's there too. So both prongs, just like [d]efendant Solis, apply."

Juarez's defense counsel similarly argued to the jurors: "*Conspiracy to commit first-degree murder*: It's a different way of charging a murder based on . . . the agreement to commit a murder. *But it doesn't change the specific intent requirement*." (Italics added.)

### 2. Analysis

"Although murder liability is divided into different degrees and can rest on different theories [citation], conspiracy to commit murder can only take a single form: It 'requires a finding of unlawful intent to kill, i.e., express malice' [citation] and 'is necessarily conspiracy to commit premeditated and deliberated first degree murder.' " (*People v. Ware* (2022) 14 Cal.5th 151, 167 (*Ware*); see *People v. Swain* (1996) 12 Cal.4th 593, 607 (*Swain*) ["a conviction of conspiracy to commit murder requires a finding of intent to kill, and cannot be based on a theory of implied malice"].)

We review the instant claim of instructional error de novo. (*People v. Howard* (2024) 104 Cal.App.5th 625, 661.) " ' "The challenged instruction is considered 'in the

context of the instructions as a whole and the trial record to determine whether there is a reasonable likelihood the jury applied the instruction in an impermissible manner.' " [Citation.] "We of course presume 'that jurors understand and follow the court's instructions.' " ' " (*Ibid.*)

We decide there is no reasonable likelihood on this record that the jurors were confused about the express malice requirement for finding Juarez and Solis guilty of conspiracy to commit murder. The conspiracy to commit murder instruction repeatedly mentioned intent to kill and first degree murder. The instruction also expressly told the jurors not to consider implied malice and stated unequivocally that "[c]onspiracy to commit murder requires an intent to kill." Further, the arguments of counsel reinforced the specific intent requirement. Under these circumstances, we conclude that no reasonable juror would have been misled into thinking that a guilty verdict for conspiracy to commit murder could be based on implied malice.

Furthermore, even assuming arguendo that the conspiracy to commit murder instruction was erroneous, that error was not prejudicial. The jurors convicted Juarez and Solis of first degree murder on the sole theory presented, i.e., that they acted willfully, deliberately, and with premeditation. Thus, the verdicts here "inform us on what theory [the jury] found the requisite element of malice necessary to convict on the charges of conspiracy to commit murder." (*Swain*, *supra*, 12 Cal.4th at p. 607; see *People v. Beck and Cruz* (2019) 8 Cal.5th 548, 643–644 (*Beck and Cruz*) [instructional error harmless where jury found defendants guilty of first degree premeditated murders of all victims].) No reasonable possibility exists that the jurors convicted Juarez and Solis of conspiracy to commit murder without first finding an intent to kill. Thus, any instructional error was harmless beyond a reasonable doubt.

E. *Denial of Severance*

Juarez contends the trial court abused its discretion and violated his constitutional rights by denying his severance motion "without reviewing the inflammatory content of

[Solis]'s police interview." Juarez further asserts that his defense counsel was constitutionally ineffective in failing to seek a mistrial when the prosecution presented Solis's police interview to the jury.

The Attorney General responds that the trial court properly exercised its discretion to deny severance and, regardless, any error was harmless.[26]

### 1. Additional Background

The district attorney jointly prosecuted Juarez and Solis throughout the trial court proceedings.

Pretrial, Juarez moved to sever his case from the prosecution of his codefendants. Juarez raised his written severance request within an omnibus pleading that also requested bifurcation of the gang enhancement allegations (§ 1109) and exclusion of gang-related evidence. Regarding severance, Juarez argued that allowing his "weak case to be joined with the stronger, corroborated[] cases against his co-defendants would result in a prejudicial spillover effect." He further asserted that allowing the jury to hear gang-related evidence that concerned "his alleged friends" (but was irrelevant as to him) would render him "effectively guilty by association."

At a pretrial hearing, the trial court denied Juarez's motion to sever his case from Solis's case. The court explained: "These defendants should be jointly tried together. It is essentially the same evidence. I'm not convinced that [Juarez] is essentially being bootstrapped in, based upon weaker or lesser evidence. [¶] It is clearly different evidence. But the evidence appears to be equally strong as against both defendants. There's a class of crimes. I do not see any significant prejudice for trying them together."

Independent of his severance motion, Juarez moved in limine to exclude all police officers' "questions and statements in suspect interviews which are not relevant and

---

**[26]** The Attorney General notes that he does not assert forfeiture regarding Juarez's severance claim and further asserts that defense counsel's failure to seek a mistrial "has no place in the severance analysis."

constitute hearsay." (Boldface & capitalization omitted.) In this motion, Juarez wrote: "Juarez objects to [o]fficers' statements on the grounds they constitute hearsay, call[] for speculation, [and] fail to explain or provide context for suspects' answers. Juarez requests a[n Evidence Code section] 402/403 hearing to determine scope of admissibility." When addressing this in limine motion at a pretrial hearing, the trial court stated, "[T]hat's a trial objection. We just have to wait and hear. If it relates to an interview being played, then we still need the proffer of what's going to be played." Juarez's defense counsel responded, "Okay."

Additionally, Solis moved in limine to exclude any evidence of or reference to statements that he made to police after he had invoked his right to remain silent. Like Juarez, Solis also asserted that "any statements made by Detective Guzman [during the police interview] are hearsay without an exception and should be excluded." When Solis's motion was addressed at a pretrial hearing, the prosecutor said that he had spoken to Solis's defense counsel about his objection and, further, asked the trial court to "hold off on any ruling" at that moment. In response, the court deferred ruling on Solis's motion and told the parties to provide any material they thought it should consider in ruling on the issue.

Later, when the parties and trial court again discussed Solis's police interview, the prosecutor and Solis's defense counsel updated the court on their negotiations regarding potential edits and redactions. The prosecutor said he expected to comply with Solis's defense counsel's requests regarding edits and redactions and that the only disputed issue would concern a determination of the precise point at which Solis had invoked his right to remain silent. The court asked Juarez's defense counsel if she had any "issue on this recording" of Solis's police interview. Counsel responded, "I have no dog in this fight, no."

Ultimately, neither Juarez nor Solis objected when the prosecution played Solis's police interview for the jury and moved the interview into evidence.

40

## 2. Legal Principles

"There is a statutory preference for joint trials of jointly charged defendants. (§ 1098.) ' "The court may, in its discretion, order separate trials if, among other reasons, there is an incriminating confession by one defendant that implicates a codefendant, or if the defendants will present conflicting defenses. [Citations.] Additionally, severance may be called for when 'there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.' " ' " (*People v. Masters* (2016) 62 Cal.4th 1019, 1048 (*Masters*).)

A "classic case for a joint trial" exists when defendants are " 'charged with the same crimes arising from the same events.' " (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 379.) "Simply because the prosecution's case will be stronger if defendants are tried together, or that one defense undermines another, does not render a joint trial unfair. [Citation.] Indeed, important concerns of public policy are served if a single jury is given a full and fair overview of the defendants' joint conduct and the assertions they make to defend against ensuing charges." (*Ibid.*)

" ' "We review a trial court's denial of a severance motion for abuse of discretion based on the facts as they appeared when the court ruled on the motion. [Citation.] If we conclude the trial court abused its discretion, reversal is required only if it is reasonably probable that the defendant would have obtained a more favorable result at a separate trial. [Citations.] If the court's joinder ruling was proper when it was made, however, we may reverse a judgment only on a showing that joinder ' "resulted in 'gross unfairness' amounting to a denial of due process." ' " ' " (*Masters*, *supra*, 62 Cal.4th at pp. 1048–1049.) Moreover, "[i]f further developments occur during trial that a defendant believes justify severance, he must renew his motion to sever." (*People v. Ervin* (2000) 22 Cal.4th 48, 68 (*Ervin*).)

41

Regarding ineffective assistance of counsel, an "attorney's failure to object . . . to seriously damaging, inadmissible evidence which played a major role in the verdict of guilt" may signify constitutionally ineffective assistance. (*People v. Sundlee* (1977) 70 Cal.App.3d 477, 485.) However, a "mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*People v. Ghent* (1987) 43 Cal.3d 739, 772 (*Ghent*).)

"To make out a claim that counsel rendered constitutionally ineffective assistance, 'the defendant must first show counsel's performance was deficient, in that it fell below an objective standard of reasonableness under prevailing professional norms. Second, the defendant must show resulting prejudice, i.e., a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different.' " (*People v. Hoyt* (2020) 8 Cal.5th 892, 958 (*Hoyt*); see also *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) We can reject the claim on either element of the standard. (*Strickland*, at p. 687; *People v. Kirkpatrick* (1994) 7 Cal.4th 988, 1008, disapproved on another ground in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.)

"It is particularly difficult to prevail on an *appellate* claim of ineffective assistance. On direct appeal, a conviction will be reversed for ineffective assistance only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation. All other claims of ineffective assistance are more appropriately resolved in a habeas corpus proceeding." (*People v. Mai* (2013) 57 Cal.4th 986, 1009 (*Mai*).)

   3. Analysis

Regarding severance, Juarez focuses on Solis's police interview, contending "[t]he trial court abused its discretion when it denied [his] motion to sever [before trial] without reviewing the inflammatory content of [Solis]'s police interview." Juarez further asserts

that he "put the court on notice in [his] pre-trial motions and with [his] request for a[n] [Evidence Code section] '402/403 hearing' that review of [Solis]'s confession was necessary for the parties to meaningfully litigate the severance motion. [Citation.] The court abused its discretion by failing to apply binding legal authority holding that 'severance should generally be granted in the face of an incriminating confession by a co-defendant.' "

We are not persuaded. In his appellate briefing, Juarez claims that his defense counsel "urged that severance was warranted due to," inter alia, "co-defendant [Solis]'s 'incriminating confession.' " This assertion misreads Juarez's severance motion. The phrase " 'incriminating confession' " appears in a sentence in Juarez's motion that is almost entirely a quotation from a California Supreme Court case, *People v. Massie* (1967) 66 Cal.2d 899, 917.[27] Nowhere in that sentence (or elsewhere in his argument for severance) did Juarez specifically assert that Solis's police interview provided a basis for severing his case from Solis's case. Rather, Juarez grounded his argument for severance on the relative weakness of the evidence against him and the "prejudice of having his jury hear gang-related evidence that is unrelated and irrelevant to him." Because Juarez never asked the trial court to review or consider Solis's police interview in deciding his severance motion, we are not persuaded that the court abused its discretion "when it denied Juarez's motion to sever without reviewing" the alleged inflammatory content within Solis's interview.

Nevertheless, even assuming arguendo that the trial court should have considered Solis's police interview irrespective of the scope of Juarez's severance request, the

---

[27] The relevant sentence in Juarez's motion reads as follows: "The *Massie* court stated that a trial court 'should separate the trial of co-defendants in the face of an incriminating confession, prejudicial association with codefendants, likely confusion resulting from evidence on multiple counts, conflicting defenses, or the possibility that, at a separate trial, a co-defendant would give exonerating testimony.' (*Massie, supra*, 66 Cal.2d at [pp.] 916–917, [fns.] omitted.)"

43

interview does not mandate a grant of severance. As noted *ante* (see pt. I.B.1.), Solis did not provide the police any significant information about the crime. Nor did he incriminate Juarez during the interview. Moreover, Detective Guzman's statements about him being honest with Solis and knowledgeable of the crime, as well as Guzman's references and allusions to Juarez during the interview were largely vague, not inflammatory, and cannot be fairly characterized as "claiming that Juarez played a leadership role in the murder conspiracy."

Having considered contextually all the statements that Juarez identifies as imparting false and inflammatory information, we are not persuaded that a reasonable juror would have interpreted Detective Guzman's statements as definite, affirmative proof of Juarez's culpability. Rather, a reasonable juror would likely have viewed Detective Guzman's statements as general impetuses to cajole Solis into talking about his own role in the crime. Solis's police interview posed no serious risk of compromising Juarez's trial rights or preventing the jury from making a reliable judgment about his guilt or innocence based on the evidence demonstrating his involvement in the crime.

We conclude that, had the trial court considered Solis's police interview when deciding Juarez's severance motion pretrial, the interview would not have resulted in a grant of severance and otherwise would not have affected the court's proper exercise of discretion to deny severance. For these same reasons, we decide that the subsequent admission of Solis's police interview at trial did not result in any gross unfairness depriving Juarez of due process of law. (See *Masters*, *supra*, 62 Cal.4th at pp. 1048–1049; *Ervin*, *supra*, 22 Cal.4th at pp. 68–69.)

We likewise are not persuaded by Juarez's additional claim of ineffective assistance of counsel. Juarez argues that "if this court finds that counsel forfeited her earlier objection and her earlier request under [Evidence Code sections] '402/403' for the court to conduct a mandatory review [of Solis]'s testimonial statement and exclude police hearsay about Juarez [citation], then counsel rendered ineffective assistance. Even if

44

counsel was caught by surprise when she heard how the State chose to edit [Solis]'s interview, the defense was obligated to bring a mistrial motion because the prejudice to Juarez was beyond cure at that point."

Given that we have addressed and rejected the merits of Juarez's appellate arguments regarding his pretrial severance motion, we need not consider any alternative claim of ineffective assistance of counsel with respect to the trial court's denial of that motion. To the extent that Juarez also claims ineffective assistance of counsel with respect to defense counsel's failure to seek a mistrial when the prosecutor played Solis's police interview for the jury, that claim lacks merit because Juarez has not shown that there could be no satisfactory explanation for his defense counsel's failure to make a mistrial motion. " '[A] trial court should grant a mistrial only when a party's chances of receiving a fair trial have been irreparably damaged.' " (*People v. Schultz* (2020) 10 Cal.5th 623, 673.) Given the noninflammatory and unremarkable nature of Solis's police interview, Juarez's defense counsel reasonably could have decided that any mistrial motion grounded on the admission of that interview would have been futile. (See *People v. Price* (1991) 1 Cal.4th 324, 387 (*Price*).)

F. *Admission of Gang Evidence*

Juarez contends the trial court prejudicially erred and violated his constitutional rights by permitting the introduction of gang evidence to prove motive. Solis joins Juarez's argument in full.

As discussed *ante* (see pt. II.A.1.), the trial court, upon Juarez's and Solis's requests under section 1109, bifurcated the trial of the gang enhancement allegations from the substantive offenses. Further, over defense objection, the court ruled the prosecution could present some evidence about gangs to show motive. The court allowed gang expert testimony concerning the expert's qualifications; the background and history of the Mexican Mafia, Sureños, Nuestra Familia, and Norteños; the presence of gangs in King City and south Monterey County, the gangs' signs, symbols, and rivalries; and the

45

perpetrators' gang tattoos and indicia. The court, however, precluded the prosecution from presenting evidence of predicate offenses.

As detailed *ante* (see pt. I.B.1.), the prosecution's gang expert, Detective Partida, testified in accord with the trial court's pretrial ruling and opined that Juarez, Solis, Urrutia-Flores, and Sarabia were active Sureño members at the time of the present offense.[28]

"The trial court is vested with broad discretion in determining the admissibility of evidence." (*People v. Ortiz* (1995) 38 Cal.App.4th 377, 386.) "A trial court's decision to admit or exclude evidence is reviewed for abuse of discretion, and it will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice." (*People v. Wall* (2017) 3 Cal.5th 1048, 1069.)

"[T]he admission of evidence, even if erroneous under state law, results in a due process violation only if it makes the trial *fundamentally unfair*. [Citations.] Absent fundamental unfairness, state law error in admitting evidence is subject to the traditional *Watson* test: The reviewing court must ask whether it is reasonably probable the verdict

---

[28] The Attorney General does not assert forfeiture in response to Juarez's and Solis's appellate challenge to the admission of gang evidence. Nevertheless, as noted *ante* (pt. II.A.1.), during trial, Juarez's defense counsel stated that she had no objection to Detective Partida opining that Juarez was an active gang member. Further, immediately prior to Detective Partida's expert testimony, the trial court stated its understanding that, based on off-the-record discussions occurring after the court's in limine rulings, "the parties . . . for tactical reasons may not object to certain questions asked of the gang experts, while reserving their right to object to any individual specific questions." The parties stated their agreement with the court's statement. Thereafter, the only defense objection raised during Detective Partida's direct testimony was one by Juarez's defense counsel on the ground of "[n]onresponsive" when Partida stated his opinion that Solis "was a gang member" on the date of the instant crime. The trial court overruled that objection, and Partida testified further that Solis was an "active Sureño gang member." Notwithstanding the present record, because the Attorney General does not raise forfeiture, we will assume arguendo that Juarez's and Solis's current claim of error is preserved for our review.

would have been more favorable to the defendant absent the error." (*People v. Partida* (2005) 37 Cal.4th 428, 439 (*Partida*).)

As discussed *ante* (see pt. II.A.3.), gang evidence may be admitted as relevant to prove motive and other issues. (See *Hernandez*, *supra*, 33 Cal.4th at p. 1049; *Tran*, *supra*, 13 Cal.5th at p. 1208.) Further, "nothing in Assembly Bill 333 [(which enacted section 1109)] limits the introduction of gang evidence in a bifurcated proceeding where the gang evidence is relevant to the underlying charges." (*Ramos*, *supra*, 77 Cal.App.5th at p. 1132.)

The gang evidence allowed by the trial court in the instant prosecution was relevant and probative of material issues, including motive and intent. (See *People v. Huynh* (2021) 65 Cal.App.5th 969, 980 [" ' "Gang evidence is relevant and admissible when the very reason for the underlying crime, that is the motive, is gang related." ' "]; *Ware*, *supra*, 14 Cal.5th at p. 168 [" '[C]ommon gang membership may be part of circumstantial evidence supporting the inference of a conspiracy.' "].)

Moreover, the evidentiary examples that Juarez relies on to argue that the trial "looked almost identical" to a pre-Assembly Bill 333 trial are not persuasive. Nearly all the evidence Juarez highlights was presented in response to the actions of his own defense counsel in questioning Detective Partida. For example, Juarez points out Detective Partida testified that Spanky (the source of the MAC-10 gun) "committed prior gang crimes." The testimony Juarez cites was elicited on redirect and recross-examination, after Juarez's defense counsel referenced Spanky during her cross-examination, suggesting a distinction between Spanky ("a high-ranking MKL member") and Juarez. Similarly, the prosecutor elicited Detective Partida's redirect testimony about the active rivalry between King City's Norteño and Sureño gangs in 2017–2019, and the frequency of gang-related shootings in King City in 2017 after defense counsel had asked Partida about a "peace treaty currently [] in effect in our prison system" between the Mexican Mafia and Nuestra Familia.

47

For these reasons, we conclude section 1109 did not require exclusion of gang evidence in the bifurcated trial on the substantive offenses (see *Ramos*, *supra*, 77 Cal.App.5th at p. 1132; *Garcia*, *supra*, 107 Cal.App.5th at p. 475), and the trial court properly exercised its discretion to permit relevant gang evidence. (See *People v. Duong* (2020) 10 Cal.5th 36, 64–65; *People v. Ochoa* (2001) 26 Cal.4th 398, 438, overruled on another ground in *People v. Prieto* (2003) 30 Cal.4th 226, 263, fn. 14.)

G. *Sufficiency of Corroboration for Accomplice Testimony*

Juarez contends Angel's testimony as an accomplice was not corroborated by sufficient evidence.

Section 1111 provides, "A conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

" '[U]nder section 1111, the corroboration must connect the defendant to the crime independently of the accomplice's testimony.' [Citation.] ' "The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration." [Citations.] The evidence "need not independently establish the identity of the victim's assailant" [citation], nor corroborate every fact to which the accomplice testifies [citation], and " 'may be circumstantial or slight and entitled to little consideration when standing alone.' " ' " (*Beck and Cruz*, *supra*, 8 Cal.5th at p. 628, italics omitted.) The corroborating evidence is " ' "sufficient if it tends to connect the defendant with the crime in such a way as to satisfy the jury that the accomplice is telling the truth." ' " (*People v. Chism* (2014) 58 Cal.4th 1266, 1301 (*Chism*).) "A defendant's own testimony may be sufficient corroborative testimony, and false or misleading statements made to authorities may constitute corroborating evidence." (*People v. Vu* (2006) 143 Cal.App.4th 1009, 1022 (*Vu*).)

Surveillance video footage showed Juarez meeting with the group that was riding in the white truck at the Greenfield Valero gas station shortly before the shooting and returning to King City along with the truck a short time later. Later, text messages revealed Juarez arranging to dispose of a gun, and the police discovered a photo on Juarez's phone depicting a Glock handgun. Other evidence demonstrated that Juarez traveled to southern California with two of the perpetrators (Sarabia and Urrutia-Flores) a few days after the crime, evincing consciousness of guilt. Evidence also showed that Juarez was a Sureño, and the victim was killed in Greenfield (a Norteño town) while wearing red (a Norteño color), suggesting a motive for Juarez to conspire with the group to commit first degree murder.

Viewing the trial evidence in the light most favorable to the verdict (*People v. Garrison* (1989) 47 Cal.3d 746, 774), we conclude there was sufficient corroboration of Angel's accomplice testimony. (See *Chism*, *supra*, 58 Cal.4th at pp. 1301–1302; *Vu*, *supra*, 143 Cal.App.4th at pp. 1022–1024.)

### H. *Failure to Include Solis in CALCRIM No. 305*

The trial court instructed the jurors using CALCRIM No. 305 as follows: "You have heard evidence that defendant Jose Armando Juarez made a statement before trial. You may consider that evidence only against him, not against any other defendant."

Notwithstanding the instruction's failure to mention Solis, the prosecutor said the following about Juarez's and Solis's pretrial statements in closing argument: "Certain statements are not admissible in consideration against other people. I'll give you the two examples in this case. [¶] *You may not consider the interview of Eduardo Solis at the police station in determining Jose Juarez's guilt.* You may not consider the statements by Jose Juarez in the exhibits yesterday, in the portions of his [police] interview against Eduardo Solis. They are walled off from one another. *The instructions deep in there tell you that.* That is not the same at all for the pretext calls. [¶] You may consider the pretext calls, statements between Angel and [Solis], in assessing [d]efendant Juarez's

49

guilt. And it wasn't the main topic they talked about in those 90 minutes of calls you heard. But it did come up. There was discussion." (Italics added.)

On appeal, Juarez contends the trial court prejudicially erred and violated his constitutional rights by not including Solis in the instruction under CALCRIM No. 305.

The Attorney General responds that Juarez's appellate claim is forfeited by his failure to object to the instruction at trial and, otherwise, lacks merit. The Attorney General further contends that if any instructional error occurred, it was harmless.

Regarding forfeiture, pretrial, the prosecutor proposed that the trial court instruct with CALCRIM No. 305. Relatedly, Juarez's defense counsel wrote the following (in a defense trial brief) about the prosecutor's proposed jury instructions: "The defense adopts the [p]rosecution's proposed jury instructions with the following additions and deletions." Below this statement in the defense brief, defense counsel listed eight CALCRIM instructions, not including CALCRIM No. 305. Although the trial brief's discussion of the proposed jury instructions is somewhat unclear, we assume arguendo that, like the prosecutor, Juarez's counsel expressed a desire for an instruction under CALCRIM No. 305. Later, when the parties and trial court reviewed the jury instructions on the record after they had been read to the jury, Juarez's counsel stated her agreement with the CALCRIM No. 305 instruction as given and which did not mention Solis.

Although Juarez's defense counsel made a pretrial request for instruction with CALCRIM No. 305, we decide that defense counsel's failure to object to the instruction, as given, amounts to forfeiture. Evidence Code section 355 states, "When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." (See also *People v. Cowan* (2010) 50 Cal.4th 401, 479 ["Absent a request, a trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted."].) Because Juarez's pretrial request for instruction was nonspecific, his defense counsel's subsequent failure to object or state

50

any request for modification of the instruction under CALCRIM No. 305 to include Solis results in a forfeiture of Juarez's appellate challenge to that instruction. (See *Cowan*, at p. 480 [" 'Because defendant[] did not specifically request a limiting instruction at the appropriate time, the court had no sua sponte duty to give one.' "]; see also *People v. Freeman* (1994) 8 Cal.4th 450, 495.)

Given that Juarez's claim of instructional error is forfeited, and he makes no alternative arguments for our consideration, we reject his claim without addressing its merits.

### I. *Admission of Evidence of Pretext Phone Calls*

Juarez contends the trial court prejudicially erred and violated his constitutional right to a fair trial by admitting against him hearsay statements in the postcrime, pretext phone calls between Angel S. and Solis.

The Attorney General counters that Solis's responses to Angel's statements could be construed as adoptive admissions by Solis and, as such, statements against his penal interest. The Attorney General further asserts that the trial court did not abuse its discretion in admitting the statements under Evidence Code section 352. Alternatively, the Attorney General contends any error in admitting some or all the statements in the pretext calls against Juarez is harmless under *Watson* and *Chapman*.

#### 1. Additional Background

On May 13, 2022, the prosecutor moved in limine to admit four of six recorded pretext phone calls (totaling approximately five hours) between Angel and Solis. The prosecutor contended that the calls "are non-testimonial" under *Crawford v. Washington* (2004) 541 U.S. 36, admissible against Solis under Evidence Code section 1220, and "admissible in a joint trial with defendant Juarez under [Evidence Code section] 1230 [as statements against the declarant's interest] if defendant Solis does not testify." (There is no dispute that Solis, the declarant, did not testify and was thus unavailable as a witness.)

51

That same day, Juarez moved in limine to exclude statements made by Angel and Solis about Juarez's involvement in the killing. In his motion, Juarez described and objected to six segments of the pretext calls.

At a pretrial hearing on the in limine motions (held on May 17, 2022), the prosecutor reiterated his position that the pretext calls were admissible "insofar as [d]efendant Juarez is referenced [as] declarations against interest." The trial court directed the prosecutor to identify the specific portions of the calls he intended to introduce into evidence. The court also said it would address any objections once those portions had been identified.

The next day (May 18, 2022), when the trial court considered Juarez's in limine motion, Juarez's defense counsel noted that the prosecutor had been tasked with providing "[p]roposed segments" of the pretext calls, and counsel acknowledged that the defense objections could be addressed thereafter.

Later, on May 23, 2022 (after the first day of witness testimony at trial), Juarez's defense counsel sent an e-mail to counsel for the parties and the trial court clerk objecting to "certain excerpts of [the pretext] calls" on the grounds that the calls are testimonial; Solis's responses are hearsay and lack an exception; Solis's "condition"/sobriety at the time of his statements is unknown; Solis's " 'yeah' " responses are vague, ambiguous, unclear, and nonresponsive to Angel's statements; and the statements are "more prejudicial than probative and will also lead to jury confusion[]." Juarez's defense counsel specifically identified nine segments of the calls in her e-mail and attached transcript pages that she considered objectionable.

That same day, the prosecutor e-mailed to defense counsel and the trial court clerk transcripts of clips from the pretext calls that the prosecutor intended to introduce into evidence.

The next day (May 24, 2022), in a further written pleading delivered to the trial court, the prosecutor argued, inter alia, that all statements in the pretext calls were

trustworthy and thus admissible irrespective of any hearsay exception.  The prosecutor further argued specifically that six segments Juarez's defense counsel had identified as objectionable were "admissible based on rooted hearsay exceptions," namely as statements against Solis's interest (Evid. Code, § 1230) and/or adoptive admissions on Solis's part (Evid. Code, § 1221).

That same day, Juarez filed a written response reiterating his objection to the admission of statements in the pretext calls pertaining to him.  He argued that all the calls are testimonial and Solis's responses in the segments "pertaining to Juarez are not disserving to his interest or implicate himself in the murder [*sic*]" but rather are irrelevant collateral responses.  Juarez also asserted that Solis's responses do not amount to adoptive admissions and are unreliable.

On May 25, 2022 (before the second day of witness testimony and prior to Angel's testimony), the trial court heard oral argument from the prosecutor and Juarez's defense counsel and ruled that the clips culled by the prosecutor from the pretext calls were admissible against Juarez.  In stating its ruling, the court noted that it had "spent some time reviewing the motions, reviewing the law in this case, [and] reviewing the transcripts of these phone calls."  The court explained that "phone calls between accomplices are nontestimonial in nature"[29] and the *Aranda-Bruton*[30] rule did not apply. The court further concluded that, "reviewing each statement individually and in [] context," and considering "reasonable inferences," the statements are "nontestimonial," not subject to *Aranda-Bruton*, "not collateral," and admissible as "statements against interest or adoptive admissions.  And in some cases both exceptions apply."

During Angel's trial testimony, the prosecutor played for the jury 26 clips from three recordings of the pretext calls (and provided the jurors accompanying transcripts

---

[29] Juarez makes no argument on appeal that the pretext calls are testimonial.

[30] *People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123.

53

totaling 105 pages). The clips included eight of the nine segments that Juarez had apparently sought to exclude. For clarity of our review of Juarez's appellate claim of error, we reproduce the segments, as they appear in the transcripts, that Juarez challenges on appeal (identifying them as segment Nos. 1 through 8).

Segment No. 1: Angel: "[R]ight now, fool, I peeked out through the window, fool. There's a motherfuckin' … it's a van. A, a… van. A white one, fool." Solis: "Van?" Angel: "*Yeah, a van.* [¶] *Like the one Trips had.*"[31] (Italics added.) Solis: "Yeah."

Segment No. 2: Angel: "Those fools, there was witnesses [*sic*] …." Solis: "No." Angel: "… everywhere, man. It's because everything went wrong, man. We didn't even check around the houses, man, if there were cameras, if there were …. Anyway, man, if it had been like, if it had been like, 'Oh, yeah, we, we, we.' Well, *let's say that we used* [*Tr*]*ip's van*, right? We would all have gotten in, man. And then, then at that moment of, of, of going pop, well, we pop [?--] and we would have run away in, in my truck then, man, well, fuck it. Fuck it, man. If, then, then we would have gone down like, I would have gone down like a fucking champion, dog. But not even that, for real, man, I fucking, it was a fucking cat, for real, man. But with cops I ain't talking, dog. That's the damn satisfaction I'll have, man, until the day I die. I swear. That's some …."[32] Solis: "Well, whatever." Angel: "That …" Solis: "[?--] like that, I'm telling you, fool, like [¶] … [¶] … whatever."

Segment No. 3: Angel: "[W]e dropped that fool, uh, what the, what, what, what was for us, man? What did we make? Ok, tell me." Solis: "Well, uh, yes, right?" Angel: "Nothing, man, nothing. We didn't make anything. It's like, it's like, it's like we took out a, a fucking, a, a little piece of grass, man, from, like a big old fucking field,

---

[31] Angel testified that Juarez is also known as "Trips."
[32] It appears that "[?--]" is used in the transcripts to indicate the recording is unintelligible.

man." Solis: "Yeah." Angel: "That's it, man. That's how I see it right now, man. It's as if we took out …. [¶] …." Solis: "Yeah." Angel: "… a small piece of grass like to a big ass field, man. Imagine, man. Still, if it would have been like, imagine, man, we would have hit the heads like where, *where that guy said, that, that they were burning tires, man.*" (Italics added.) Solis: "Yeah." Angel: "Over there, over there, for real, man, I would have come down, man. Like the real men, man. I would, I would, uh …." Solis: "Yeah." Angel: "… we would have let him have it, man. It would have been nice for me, man. They could have had some chance too, man, have a shootout, man. That's one thing that …." Solis: "Yeah." Angel: "… that I didn't accomplish in my life, man, have a shootout." Solis: "Ah …."

Segment No. 4: Angel: "Because you're sure that that, that, that, that *that asshole Trips*, man, already got out the [straps] there. He's a dumbass, man." (Italics added.) Solis: "Um, we'll see, man."

Segment No. 5: Angel: "The moment I would have said a name, man … they would have hit on you … or, or … or they would have been searching for [Urrutia-Flores], man, or …." Solis: "Yeah." Angel: "… *Trips*. They would have hit on them, man. [¶] They would have fuckin' …." (Italics added.) Solis: "Yes, man." Angel: "No sooner had I said something, man … they would have … gone to *Trip's house* … just done it …." (Italics added.) Solis: "Yeah." Angel: "… *they would have hit on him right there because right there would have been the … the guns*, man." (Italics added.) Solis: "Uh-hum." Angel: W- … but the, that dude's no dumbass, man." Solis: "Uh, well, no, that guy is, is correct and [?-], right?"

Segment No. 6: Angel: "Where did we stop? Where did we stop, fool?" Solis: "Nowhere." Angel: "It's just that… no, fool. It's just that…fuck! Yeah we did, fool." Solis: "I know, I know, by nowhere." Angel: "Fuck! [¶] No shit. And *Trips, he, he, he, he hasn't said anything to you*, fool?" (Italics added.) Solis: "Nah." Angel: "You

haven't hit that fool up?  [¶]  Nothing?"  Solis:  "That was [?--] to see if, if he could do a favor, too."  Angel:  "Yeah."

Segment No. 7:  Angel:  "Fuck!  There was some fucking bad ass gang shit."  Solis: "Uh-hum.  [¶]  Those shits were bad.  [¶]  But now, and why is that good for us now, man?"  Angel:  "Well, yes, not at all.  *I bet* [*Tr*]*ips,* [*Tr*]*ips is no dumbass*, man, *that fool wants nothing to do with us*.  [Sarabia] either, man.  Um, that dude is very ungroo-, is really fuckin' ungroomed like this, man, like not giving a fuck here, and he hangs around here, man.  While I ...."  (Italics added.)  Solis:  "That dude?"  Angel:  "Yeah.  While I'm very panicked, fuck it, man.  But ...."  Solis:  "Oh, fuck!"

Segment No. 8:  Angel:  "Look, if you could get a strap, fool..."  Solis:  "Uh-hum."  Angel:  "... and, and, and some money, fool, I, I mean... at night, fool, I mean, I'll go...."  Solis:  "Yeah."  Angel:  "... I'll go, fool, once it's... like, fuckin' tweaker hours, fool, at, at three o'clock (3:00) in the morning, fool, or... *if you want*, fool, ask, *ask Trips there for the favor*, fool.  And I'll go get it over there, fool."  (Italics added.)  Solis:  "Yeah."  Angel:  "Then from there, I mean, I'm going to fucking leave, fuck it."  Solis:  "That too."  Angel:  "Yes or no?"  Solis:  "Yeah, well the... I'm gonna try tomorrow, then I'm gonna hit him up also.  I'm gonna call him to see what he says, and then I'll let you know."

As noted *ante* (see pt. II.H.), during closing argument, the prosecutor told the jurors, "You may consider the pretext calls, statements between Angel and [Solis], in assessing [d]efendant Juarez's guilt."  The prosecutor specifically mentioned (and displayed the text of) two segments of the pretext calls in this part of his argument— namely segment No. 3 (about "that guy" having mentioned a location where people

56

"were burning tires") and another segment not reproduced above (about Angel having seen the man wearing red shorts[33]).

The prosecutor suggested that these two segments corroborated Angel's testimony about the group having spotted victim Jose, meeting with Juarez at the Valero gas station, and returning to Jose's location to shoot him. The prosecutor also noted that there was no mention in the pretext calls of Juarez having delivered cocaine to Solis, which Juarez had testified was his reason for meeting the group in Greenfield.

Additionally, in rebuttal argument, the prosecutor referenced segment No. 5, noting that Angel told Solis that if he (Angel) had snitched, the police would have searched Juarez's house while "the guns" were there, which Solis acknowledged.

The trial court instructed the jurors on adoptive admissions with CALCRIM No. 357, which told the jurors they could conclude a defendant admitted a statement as true if: (1) the statement was made to the defendant or in their presence; (2) the defendant heard and understood the statement; (3) a defendant would, under all the circumstances, naturally have denied the statement if they thought it was not true; and (4) the defendant could have denied the statement but did not. The instruction also told the jurors, "If you decide that any of these requirements has not been met, you must not consider either the statement or the defendant's response for any purpose. [¶] You must not consider this evidence in determining the guilt of the other defendant."

### 2. Legal Principles

"Hearsay is 'evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated.' (Evid.

---

[33] This segment (which Juarez did not seek to exclude) reads as follows: Angel: "And when I saw that idiot with, with, with, with the red shorts, man, with red shorts, man, I was like, fuck! At first, man, I thought we were, we were clear on that shit, man. Because we passed him and …." Solis: "Yeah." Angel: "… and we ignored him, right? He scared me …." Solis: "Yeah."

57

Code, § 1200, subd. (a).)  Hearsay is not admissible unless it qualifies under some exception to the hearsay rule." (*People v. Davis* (2005) 36 Cal.4th 510, 535 (*Davis*).)

"The adoptive admissions exception generally permits hearsay to be admitted against a party, when that party has adopted it or agreed that a statement, originally made by someone else, is true.  The statute contemplates either explicit acceptance of another's statement or acquiescence in its truth by silence, equivocal or evasive conduct.  'Evidence of a statement offered against a party is not made inadmissible by the hearsay rule if the statement is one of which the party, with knowledge of the content thereof, has by words or other conduct manifested his adoption or his belief in its truth.'  (Evid. Code, § 1221.)" (*People v. Castille* (2005) 129 Cal.App.4th 863, 876, fns. omitted; see also *People v. Silva* (1988) 45 Cal.3d 604, 624 ["once the defendant has expressly or impliedly adopted the statements of another, the statements become *his own admissions*"].)

" 'In determining whether a statement is admissible as an adoptive admission, a trial court must first decide whether there is evidence sufficient to sustain a finding that: (a) the defendant heard and understood the statement under circumstances that normally would call for a response; and (b) by words or conduct, the defendant adopted the statement as true.'  [Citations.]  If so, the jury then determines whether these preliminary facts actually occurred." (*People v. Dalton* (2019) 7 Cal.5th 166, 229; see *People v. Riel* (2000) 22 Cal.4th 1153, 1189; Evid. Code, § 403.)

"For the adoptive admission exception to the hearsay rule to apply, no 'direct accusation in so many words' is necessary.  [Citation.]  Rather, it is enough that the evidence showed that the defendant participated in a private conversation in which the crime was discussed and the circumstances offered him the opportunity to deny responsibility or otherwise dissociate himself from the crime, but that he did not do so." (*Davis*, *supra*, 36 Cal.4th at p. 539, citing *People v. Fauber* (1992) 2 Cal.4th 792, 852.)  "Whether the statement constitutes an adoptive admission is 'determined upon the facts

58

and circumstances therein presented.' " (*People v. Roberts* (2011) 195 Cal.App.4th 1106, 1121 (*Roberts*).)

Evidence Code section 1230 provides an exception for an unavailable hearsay declarant's statements against interest. That section "permits the admission of any statement that 'when made, was so far contrary to the declarant's pecuniary or proprietary interest, or so far subjected him to the risk of civil or criminal liability, or so far tended to render invalid a claim by him against another, or created such a risk of making him an object of hatred, ridicule, or social disgrace in the community, that a reasonable man in his position would not have made the statement unless he believed it to be true.' " (*People v. Grimes* (2016) 1 Cal.5th 698, 710–711 (*Grimes*), quoting Evid. Code, § 1230.) "As applied to statements against the declarant's penal interest, in particular, the rationale underlying the exception is that 'a person's interest against being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest,' thereby mitigating the dangers usually associated with the admission of out-of-court statements." (*Grimes*, at p. 711.)

"To demonstrate that an out-of-court declaration is admissible as a declaration against interest, '[t]he proponent of such evidence must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character.' [Citation.] 'In determining whether a statement is truly against interest within the meaning of Evidence Code section 1230, and hence is sufficiently trustworthy to be admissible, the court may take into account not just the words but the circumstances under which they were uttered, the possible motivation of the declarant, and the declarant's relationship to the defendant.' " (*Grimes*, *supra*, 1 Cal.5th at p. 711; see also *id*. at p. 712 [noting that statements were correctly admitted under Evid. Code, § 1230 "because a reasonable person in [the declarant]'s position would have believed that the[] admissions would subject him to criminal liability"]; *People v. Jackson* (1991) 235

Cal.App.3d 1670, 1678 (*Jackson*) [stating that the test to determine whether a statement is against the declarant's penal interest is "an objective one"].)

We review a trial court's decision whether a statement is admissible under Evidence Code section 1221 or 1230 for abuse of discretion. (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132–133, 135 (*DeHoyos*) [adoptive admission]; *Grimes*, *supra*, 1 Cal.5th at pp. 711–712 [statement against interest].)

Only relevant evidence is admissible at trial. (Evid. Code, § 350.) Evidence Code section 352 " 'requires the exclusion of evidence only when its probative value is *substantially* outweighed by its prejudicial effect. "Evidence is substantially more prejudicial than probative [citation] [only] if, broadly stated, it poses an intolerable 'risk to the fairness of the proceedings or the reliability of the outcome.' " ' " (*People v. Jones* (2013) 57 Cal.4th 899, 948 (*Jones*).)

"We will not reverse a court's ruling on [relevance and admissibility under Evidence Code section 352] unless it is shown ' "the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice." ' " (*People v. Merriman* (2014) 60 Cal.4th 1, 74.) Further, " '[t]he admission of relevant evidence will not offend due process unless the evidence is so prejudicial as to render the defendant's trial fundamentally unfair.' " (*Jones*, *supra*, 57 Cal.4th at p. 949.) "The 'routine application of state evidentiary law does not implicate [a] defendant's constitutional rights.' " (*People v. Hovarter* (2008) 44 Cal.4th 983, 1010.)

### 3. Analysis

As a preliminary matter, we are not persuaded by Juarez's various challenges to the process by which the trial court decided the admissibility of the pretext call, including that the trial court "fail[ed] to undertake the necessary fact-intensive inquiry before admitting" the calls and "declined to address Juarez's individual legal and factual objections."

60

As detailed in the background section (see pt. II.I.1., *ante*), the prosecutor transmitted to the trial court and defense counsel the proposed clips culled from the pretext calls two days before the court ruled on their admissibility. Juarez's defense counsel also sent an e-mail that day to the trial court clerk and counsel for the parties stating her objections to certain segments of the calls. In addition, the prosecutor and Juarez's defense counsel transmitted their further pleadings on the calls to the court the next day. Moreover, when the trial court ruled the following day on the admissibility of the calls (after hearing oral argument), the court said it had "spent some time" reviewing the motions, law, and "transcripts of these phone calls." The court also stated that it was "reviewing each statement individually and in [] context" in deciding the admissibility of the statements.

Based on this record, we conclude the trial court adequately and independently assessed the admissibility of each statement subject to an objection by Juarez. (Cf. *People v. Gallardo* (2017) 18 Cal.App.5th 51, 72.) Moreover, Juarez's appellate arguments fail because his defense counsel did not object to the process used to determine the admissibility of the pretext calls, and on appeal, he does not demonstrate any specific prejudice resulting from the process. (See *Partida*, *supra*, 37 Cal.4th at pp. 437–438; *People v. Nelson* (2012) 209 Cal.App.4th 698, 711.)

We likewise are not persuaded by Juarez's argument that the prosecutor made false and misleading statements when arguing that segment Nos. 1, 2, and 3 were admissible under hearsay exceptions. Assuming arguendo that Juarez's appellate challenge is not forfeited and viewing the prosecutor's statements in the context of the corresponding clips, we discern nothing in the prosecutor's assertions that would have misled the trial court on the factual circumstances relevant to its ruling on those segments. Similarly, we are not convinced by Juarez's related argument that his defense counsel rendered constitutionally ineffective assistance by failing to object to the prosecution's alleged misrepresentation of relevant precedent and the factual content of

61

the pretext calls. There was no misleading information to which a reasonably competent counsel would have specifically objected, and there is no reasonable probability the outcome of the litigation on the pretext calls or the jury's verdict would have been different had counsel objected for the reasons Juarez advances on appeal.

Turning to the segments in the pretext calls that pertain to Juarez, in his appellate briefing, Juarez only discusses the details of segment Nos. 1, 2, and 3. He contends the statements incriminating him did not qualify as adoptive admissions by Solis, were not admissible as Solis's statements against penal interest, and should have been excluded under Evidence Code section 352. Notwithstanding Juarez's failure on appeal to specifically address all eight segments described *ante* (see pt. II.I.1.), given the trial court's generally stated ruling on the admissibility of the statements pertaining to Juarez and the Attorney General's failure to assert forfeiture on appeal, we will examine each of the eight admitted segments in context to determine whether the trial court abused its discretion in admitting the segment into evidence. (See *Grimes*, *supra*, 1 Cal.5th at p. 716; *Roberts*, *supra*, 195 Cal.App.4th at p. 1121; see also *Williamson v. United States* (1994) 512 U.S. 594, 603.)

In segment No. 1, Angel told Solis that he (Angel) had just peeked out a window and saw a white van "[l]ike the one Trips had." Solis replied, "Yeah." Preceding this exchange, Angel talked about, inter alia, victim Jose's gang affiliation, Angel's interactions with a detective who had said the police " 'found gunpowder,' " and the media's coverage of the killing. In addition, Solis described the matter as "a big case" and said he would watch a news story about the killing and call an unidentified "homie" (whom Solis had been in touch with previously) "just [to] see what he says."

In this context, Angel's statement about seeing a van like the one Juarez had suggested a connection between the van, the killing, and Solis, and offered Solis an opportunity to deny his involvement in the crime, but Solis did not utter any such denial. Thus, the statement about Juarez's van amounts to an adoptive admission concerning the

62

crime. The statement also is against Solis's penal interest and reliable, in that, neither Solis nor Angel attempted to minimize responsibility or shift blame to Juarez. (*People v. Flinner* (2020) 10 Cal.5th 686, 736 ["no portion of [declarant]'s statements sought to shift blame for [the victim]'s death away from himself, and he made the statements to a close friend"].) Under these circumstances, the trial court did not abuse its discretion in admitting segment No. 1 under Evidence Code sections 352, 1221, and 1230.

In segment No. 2, Angel talked to Solis about the presence of witnesses when the "fools" started shooting and said "[w]e didn't even check" the area for cameras. Angel then offered an alternative scenario in which "we" would have "used [Tr]ip's van" to travel to the crime scene and fled in Angel's truck. Angel felt that in this scenario, he would have been a "champion" (rather than a "cat"), but he reassured Solis that he (Angel) was not talking to the police and swore he would not do so, to which Solis responded (twice) with "whatever." Preceding this exchange, Angel had expressed his alleged desire to abscond to Mexico. Solis said he was going to try to get Angel some money and was not going to let Angel down because Angel's "situation" "ain't no game." Solis also denied that "we" did "anything" when Angel said they had "fucked up" and counseled Angel that there was no need to dispose of his phone.

In this context, Angel's description of his and Solis's mistakes and an alternative scenario for the shooting that included the use of Juarez's van in addition to Angel's truck, coupled with Angel's assurances that he was not talking to police suggested a connection between the van, the shooting, and Solis, which Solis did not deny. For the same reasons stated as to segment No. 1, segment No. 2 was admissible under Evidence Code sections 352, 1221, and 1230.

Regarding segment No. 3, Angel explained that "we dropped that fool" but did not produce any substantial result. Solis responded to Angel's remarks with words of agreement (i.e., "yes" and "Yeah"). Angel next told Solis to "imagine" that they had "hit the heads" "where that guy said . . . they were burning tires" and how that "would have

63

been nice" for Angel and might have resulted in a shootout. Solis responded to Angel's statements by saying "Yeah" three times. Given that Angel explicitly invoked his and Solis's involvement in the killing before providing his alternative scenario for their behavior, the trial court could have reasonably concluded that, upon hearing Angel's statements, a person in Solis's position would attempt to dissociate himself from the killing and the reference to the alternate targets presented by "that guy." These statements also do not shift any blame away from Angel and Solis to "that guy." Under these circumstances, segment No. 3 was admissible under Evidence Code sections 352, 1221, and 1230.

Immediately preceding segment No. 4, Angel talked with Solis about allowing time to pass and how "[l]ittle by little" "[e]verything's gonna go good [*sic*]." Angel next raised whether Solis was sure about Juarez having "already got out the [straps]" (i.e., guns). To this statement, Solis responded with "we'll see." Angel continued by stating that someone called "Gonzo" "doesn't have them there anymore" and had "[p]robably moved 'em." Solis responded, "The safest thing." Angel and Solis turned next to discussing snitching, which lead to segment No. 5. In that exchange, Angel reiterated that if he had given the police any names, the police would have already "hit on" (i.e., pursued) Solis, Urrutia-Flores, or Juarez and would have gone to Juarez's home. To these statements, Solis responded "Yeah" or "Yes." Angel added that the police would have "hit on" Juarez at his house because the guns would have been there. Solis responded, "Uh-hum." Thereafter, Angel said that "right now . . . it's over with" and "[a]t least [Solis] ha[d] good aim." Solis responded, "It's right on" and "that's the only thing good." When Angel asked Solis if he "didn't hit him with some high caliber [*sic*]," Solis said both "Yeah" and "well, no, just regular." Angel and Solis then continued discussing ammunition.

In this context, Solis's failure to deny knowledge of whether Juarez still possessed the guns amounts to an admission of Solis's participation in the shooting and knowledge

64

of who possessed the guns in the aftermath. Further, Solis's and Angel's discussion of Juarez's possession of the guns is reliable because they do not attempt to shift blame for the killing to Juarez; rather they acknowledge their own involvement in the killing and discuss Juarez's more attenuated role related to his possession of the guns. Thus, segment Nos. 4–5 were admissible under Evidence Code sections 352, 1221, and 1230.

Regarding segment No. 6, Angel stated that he had been thinking about King City's surveillance cameras and told Solis to "[i]magine[] they get the homie driving." Solis responded, "Nah" and "They [(presumably the police)] ain't got it, fool." Angel next asked Solis "Where did we stop? Solis responded, "Nowhere." But when pressed by Angel about having made a stop, Solis admitted, "I know, I know, by nowhere." Angel responded, "No shit" and asked if Juarez had said anything to Solis. Solis said "Nah" and made a vague comment about seeing if "he could do a favor."

In context, the trial court could reasonably conclude that Solis admitted driving in King City with Angel and a "homie" in connection with the crime and stopping somewhere. Given that Angel next asked whether Juarez had said anything to Solis, the trial court could further conclude that Juarez was connected to the group's stop. This exchange between Angel and Solis incriminated Solis in the crime and is reliable in that Solis seemed reluctant to discuss the stop. Under these circumstances, segment No. 6 was admissible under Evidence Code sections 352, 1221, and 1230.

In sum, we conclude that the trial court did not abuse its discretion in admitting segment Nos. 1–6 into evidence against Juarez.

In segment No. 7, Angel expressed his guess that Juarez was "no dumbass" and wanted nothing to do with Angel and Solis. Assuming arguendo that segment No. 7 was a hearsay statement that should not have been admitted against Juarez, we conclude, beyond a reasonable doubt, that this mention of Juarez did not render the trial fundamentally unfair and was harmless beyond a reasonable doubt. Angel's speculation

about Juarez's shrewdness and desire to remain distant from Angel and Solis does little to implicate Juarez in the crime.

Likewise, assuming arguendo that segment No. 8 should not have been admitted against Juarez, that error also was harmless beyond a reasonable doubt. In segment No. 8, Angel's initial proposal about Solis obtaining a gun and money for Angel is not explicitly linked to the subsequent "favor" that Angel asks Solis to request from Juarez. On the present record, we conclude there is no reasonable possibility that Angel's ambiguous reference to requesting a favor from Juarez contributed to a juror's decision to convict Juarez of the charged crimes. Moreover, even considering segment Nos. 7 and 8 together for the purpose of prejudice, we decide their admission was harmless beyond a reasonable doubt.

J. *Ineffective Assistance of Counsel Regarding Instruction on Statements Against Interest*

Juarez contends his defense counsel provided constitutionally ineffective assistance by failing to request a jury instruction defining the statement against penal interest hearsay exception in relation to the pretext calls between Angel and Solis.

As discussed *ante* (see pt. II.E.2), Juarez must show deficient performance and prejudice to prevail on a claim of ineffective assistance of counsel. (*Hoyt*, *supra*, 8 Cal.5th at p. 958; *Strickland*, *supra*, 466 U.S. at p. 687.) Moreover, on direct appeal, we will reverse for ineffective assistance only in limited circumstances, including that "there simply could be no satisfactory explanation" for counsel's allegedly deficient act or omission. (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

Juarez does not point this court to any precedent holding that, upon a defense request, the trial court must instruct the jurors on the statutory requirements of the declaration against interest hearsay exception (Evid. Code, § 1230). In fact, California's Evidence Code is contrary to Juarez's assertion. "Whether a statement is one against penal interest is a preliminary fact to be determined [by the court] under [Evidence Code]

66

section 405." (*Jackson*, *supra*, 235 Cal.App.3d at p. 1678, citing *People v. Huggins* (1986) 182 Cal.App.3d 828, 832; see also *People v. Chapman* (1975) 50 Cal.App.3d 872, 879 [trustworthiness of a declaration against interest is a preliminary factual determination under Evid. Code, § 405].)  "Under [Evidence Code] section 405, the court's ruling on the question of admissibility is final and not subject to the jury's redetermination.  [Citation.]  As explained in the committee comments [on Evidence Code section 405]:  'The rules of admissibility being applied by the judge under [Evidence Code s]ection 405 are designed to withhold evidence from the jury because it is too unreliable to be evaluated properly or because public policy requires its exclusion. The policies underlying these rules are served only by the exclusion of the evidence.  No valid public or evidentiary purpose is served by submitting the admissibility question again to the jury.' "  (*People v. Cottone* (2013) 57 Cal.4th 269, 284.)

Because Juarez has not shown a valid ground upon which his defense counsel could have obtained a jury instruction on the declarations against interest, Juarez fails to demonstrate that there could be no satisfactory explanation for his counsel's inaction or that his counsel's inaction amounts to deficient performance.  (See *Price*, *supra*, 1 Cal.4th at pp. 386–387; *Hernandez*, *supra*, 33 Cal.4th at pp. 1052–1053.)

K. *Alleged Judicial Bias*

Juarez contends the trial court was biased against the defense and his defense counsel and thereby violated his constitutional rights to due process and a fair trial.

The Attorney General responds that Juarez forfeited most of his allegations of judicial bias by failing to object in the trial court.  The Attorney General further asserts that "[t]aken as a whole, the record fails to establish bias."

1.  Legal Principles

" ' "A criminal defendant has due process rights under both the state and federal Constitutions to be tried by an impartial judge." ' [Citation.]  Establishing a violation of this right requires 'an objective assessment of the circumstances in the particular case'

67

and ' " 'the probability of actual bias on the part of the judge or decisionmaker [that] is too high to be constitutionally tolerable.' " ' [Citations.] '[I]t is the exceptional case presenting extreme facts where a due process violation will be found.' " (*Nieves*, *supra*, 11 Cal.5th at p. 498.) When the " 'extreme facts' . . . raise an objective likelihood that the trial judge [] was actually biased against the defendant," the error is structural. (*Id*. at p. 499.) Otherwise, an appellate court will assess a trial court's misconduct for prejudice. (*Ibid*.)

Our Supreme Court has "cautioned that '[t]rial judges "should be exceedingly discreet in what they say and do in the presence of a jury" ' [citation] and their comments ' "must be accurate, temperate, nonargumentative, and scrupulously fair" ' [citation]. ' "Although the trial court has both the duty and the discretion to control the conduct of the trial [citation], the court 'commits misconduct if it persistently makes discourteous and disparaging remarks to defense counsel so as to discredit the defense or create the impression it is allying itself with the prosecution' [citation]. Nevertheless, '[i]t is well within [a trial court's] discretion to rebuke an attorney, sometimes harshly, when that attorney asks inappropriate questions, ignores the court's instructions, or otherwise engages in improper or delaying behavior.' " ' " (*Nieves*, *supra*, 11 Cal.5th at p. 477.)

Further, a trial court can "properly limit questions and interpose its own objections under . . . section 1044, which outlines a judge's duty to control trial proceedings and limit the introduction of evidence to relevant and material matters." (*Nieves*, *supra*, 11 Cal.5th at p. 439.) Similarly, " '[a] numerical disparity between sua sponte interventions . . . does not on its own constitute misconduct.' " (*Id*. at p. 485.) However, "[a] trial court may not 'impl[y] to the jury that defense counsel was deliberately asking improper questions in order to place inadmissible evidence in front of the jury.' " (*Id*. at p. 483; see also *id*. at p. 485 [" ' " '[A] trial court's numerous rulings against a party — even when erroneous — do not establish a charge of judicial bias, especially when they are subject to review.' " ' "].)

"We review claims of judicial misconduct under the de novo standard and on the basis of the entire record." (*People v. Williams* (2021) 60 Cal.App.5th 191, 202; see also *People v. Peoples* (2016) 62 Cal.4th 718, 789 (*Peoples*).)

### 2. Analysis

Juarez cites more than 20 instances of alleged mistreatment to support his claim that the trial court "threw its weight behind the prosecution throughout the trial and conveyed its displeasure with" Juarez's defense counsel. Juarez points to the trial court's policies and practices that "created roadblocks to the defense's ability to object and make an adequate record" (boldface & capitalization omitted); an interruption of defense counsel's opening statement after a prosecution objection; permissive reactions toward the prosecution's delayed disclosure of evidence; an exhibition of intemperance at an off-the-record hallway conference held during Angel S.'s direct testimony, in which the court dismissively scolded defense counsel[34]; interruptions and undue interference with defense counsel's cross-examination of Angel; disparate treatment between the prosecution and the defense in addressing deferred and late emerging evidentiary motions; sua sponte interruptions of defense counsel's cross-examination of Detective Partida; and sua sponte interruptions during the testimony of defense gang expert Dr. De La Cruz.

Although Juarez alleges numerous instances of bias and misconduct on appeal, at trial, his defense counsel objected to only one such instance—which occurred in an off-the-record hallway conference during Angel's direct testimony. There, counsel asserted that the trial court was, inter alia, dismissive of counsel and had been treating her differently from the male trial attorneys based on her sex.

---

[34] During its initial instructions to the jurors, the trial court explained the hallway conferences as follows: "During the course of the trial, as I've indicated, I will be meeting with the counsel outside the presence of the jury. There'll be two types. The brief ones, the ones I anticipate are brief will be out in the hallway. Longer ones will be in the courtroom and I'll excuse the jury. Please do not speculate on these proceedings. And we will try and be as efficient as possible."

"As a general rule, judicial misconduct claims are not preserved for appellate review if no objections were made on those grounds at trial. [Citations.] However, a defendant's failure to object does not preclude review 'when an objection and an admonition could not cure the prejudice caused by' such misconduct, or when objecting would be futile." (*People v. Sturm* (2006) 37 Cal.4th 1218, 1237 (*Sturm*); see also *People v. Armstrong* (2019) 6 Cal.5th 735, 799 ["Only claims of 'pervasive judicial bias' are preserved in the absence of an objection, on the ground that objection in that instance may be futile."].)

Having reviewed the entire record and all the alleged instances of judicial bias and misconduct asserted by Juarez on appeal, we conclude no exception to the general requirement of an objection applies. Juarez does not demonstrate any pervasive bias or hostility against his defense counsel or the defense, or that an admonition as to alleged instances of misconduct would have been ineffectual. Hence, Juarez's appellate challenges to all but one instance of alleged bias and misconduct (which we address below) are forfeited. (See *People v. Houston* (2012) 54 Cal.4th 1186, 1220.)

Moreover, even if we were to consider, on the merits, the instances of alleged bias and misconduct to which Juarez did not object, we would conclude that Juarez "fails to demonstrate any judicial misconduct or bias, let alone misconduct or bias that was 'so prejudicial that it deprived defendant of " 'a fair, as opposed to a perfect, trial.' " ' " (*People v. Maciel* (2013) 57 Cal.4th 482, 533.) Although the trial court was occasionally impatient or abrupt with Juarez's defense counsel and often interrupted during her witness examinations, the court's conduct did not exceed the bounds of appropriate judicial behavior. (See *People v. Woodruff* (2018) 5 Cal.5th 697, 772 (*Woodruff*).) Further, to the extent Juarez claims that the trial court's conduct also violated his right to confront and cross-examine witnesses or to present a defense, we are not persuaded by that assertion. "[N]ot every restriction on a defendant's cross-examination violates the Constitution. The trial court retains wide latitude to restrict repetitive, prejudicial,

confusing, or marginally relevant cross-examination." (*People v. Sánchez* (2016) 63 Cal.4th 411, 450–451.)

Regarding the instance of alleged misconduct to which Juarez's defense counsel objected at trial, the following circumstances transpired on the second day of witness testimony: During the direct examination of Angel, the prosecutor elicited the fact that Angel's family had been relocated and given financial assistance after Angel agreed to cooperate. In response to further questioning by the prosecutor, Angel testified that his parents eventually found new jobs, and he finished school. When the prosecutor asked whether Angel had worked while he was in school, Angel responded by saying, "At the --." The trial court interrupted and asked to "see counsel briefly in the hallway."

After some off-the-record discussion in the hallway, the trial court and the parties returned to the courtroom and the court excused the jury. The court recounted what had occurred during the hallway conference. The court explained that it had interrupted the prosecutor's questioning due to its concern that Angel would disclose unnecessary details about where he had worked and had suggested that the prosecutor use leading questions to get through Angel's work history. The court continued: "At that time [Juarez's defense counsel] Ms. Higgins indicated how is this relevant [*sic*]. And I tried to explain it to Ms. Higgins how the issue was relevant as to the witness's state of mind into entering into the agreement and the course of what's occurred in this case. [¶] At that time Ms. Higgins expressed exasperation with what I had said, visible exasperation. I cautioned her that that's not the proper way to handle my ruling. She then . . . indicated that I was dismissive of her. At that time I stopped the discussion in the hallway to put everything at that point on the record."

After Solis's defense counsel and the prosecutor confirmed the accuracy of the trial court's summary, the court asked Juarez's defense counsel if she wished to add to the summary. Counsel responded: "Yes. I take issue with 'exasperation.' I think frustration is more like -- more akin to what's going on over the course of this." Counsel

71

added:  "I took issue with the condescending tone and the disrespectful tone that the [c]ourt addressed me in dismissing my desire to express why I felt it was irrelevant.  [¶]  In fact, the [c]ourt literally used its arm and went like this to me (indicating) as if what I had to say is irrelevant.  I find that the [c]ourt treats counsel as a female attorney with bias.  You're treating me differently than you do the male attorneys.  [¶]  I don't know if you're aware of that.  But you have on several occasions treated me in a dismissive way.  You have not let me properly set forth my objections.  You'll state, 'Well, it's in the motion.'  Your behavior has undermined . . . in my view my relationship with my client.  And I don't want to be treated like that.  [¶]  I want to be treated with the same level of decorum, respect, allowance to express my legal . . . objections in a . . . way that I'm not rushed.  And that's it.  And then I am willing to abide and I have abided by the [c]ourt's rulings.  I've not violated any of the [c]ourt's rulings.  [¶]  But these types of things have occurred.  And I don't know if you're aware of it.  But now you are.  And I think we should be able to go forward with it not happening anymore."

Acknowledging that "everybody thinks" they are unbiased, the trial court said it did not feel that it had acted in a biased manner toward defense counsel based on her sex. The court admitted that it had at times cut counsel off "like I do any attorney in any motion when they're repeating what I've already read."  The court further noted that earlier in that day's proceeding, it had permitted counsel to reiterate her written arguments.  The court added that the prosecutor was familiar with the court's tendency and had "indicated in argument, I'm not going to repeat what I've already said in my motion because [the prosecutor] knows I cut off attorneys when they're repetitive because we have jurors waiting.  And I said repeatedly 'we have jurors waiting.' "[35]

---

[35] At the start of the court proceedings that day, the trial court addressed several pending evidentiary issues outside the presence of the jury, including the admission of the pretext calls against Juarez.  The court noted that it had received the parties' additional pleadings on the pretext calls and asked the prosecutor for his "[f]inal comments" on the

72

The trial court apologized if defense counsel thought the court's conduct was biased against her because she was a woman. The court acknowledged feeling "a little bit of frustration when something is repeated two or three times." The court added, "So I apologize if I get frustrated when you repeat something. But I will try and watch myself." Regarding the waving of its hand, the court acknowledged it "sounds like something I would do. So I assume I did do that. So I apologize if that was dismissive. It wasn't because of your sex. It was dismissive because of your legal argument. And I shouldn't do that to anyone, much less of any identifiable class. But sometimes I do get frustrated with certain objections. And so it's kind of a move on and dismissive. And that is correct, it is dismissive."

The trial court concluded its remarks by saying that it wanted to "focus on the case" and the "legal objections" and "move forward in this case." The court asked defense counsel if she wished to respond to the court's comments. Counsel said, "No."

We do not discern trial court bias or misconduct in this circumstance that amounted to a violation of Juarez's due process and fair trial rights. During the hallway conference, the court allowed Juarez's defense counsel to state her position on the relevance of Angel's work history and appropriately decided that that history was relevant to Angel's state of mind and conduct but should be limited to prevent any

---

issue. The prosecutor responded, "Nothing much to add beyond what I filed" and then reiterated his position (in four sentences) that the pretext calls were trustworthy and that the contested statements were akin to those in the authorities cited in his pleading. Thereafter, the court heard argument from Juarez's defense counsel and stated its ruling. Additionally, the court addressed a request by the prosecutor to reconsider a prior ruling excluding a statement posted on Facebook by Urrutia-Flores that mentioned Juarez. The court chastised the prosecutor for making this request saying, "So I'm not sure why we're revisiting this, other than it's, I'd like to have the [c]ourt really, really listen to what I said before." After allowing the prosecutor to state how his new argument was different from his prior argument, the court said it did not "need[] to hear from [the] defense on this issue" and affirmed its prior ruling. Later in the same proceeding, the court twice noted for counsel that the jury was waiting for the day's proceeding to begin.

exposure of his and his family's whereabouts. As the court subsequently admitted, it should not have waved its hand dismissively in response to defense counsel's argument. However, such intemperate behavior—while regrettable—does not amount to bias or misconduct. (See *People v. Bell* (2007) 40 Cal.4th 582, 605, disapproved of by *People v. Sanchez* (2016) 63 Cal.4th 665, 686, fn. 13; *Sturm, supra*, 37 Cal.4th at p. 1233.)

Although Juarez's defense counsel alleged prior dismissive and disparate treatment by the trial court, counsel did not make any such assertions during the prior proceedings and had not previously faulted the court for failing to allow counsel to fully state the defense objections. Additionally, after this incident, counsel did not again fault the court for any alleged bias or misconduct. Based on our review, the record does not demonstrate that the trial court improperly curtailed defense counsel's ability to state her position on pending issues. Further (while understanding that the cold record seldom captures tones of voice or facial expressions (see *People v. Poore* (2022) 13 Cal.5th 266, 297)), we do not discern from the transcripts that the trial court treated defense counsel disparately from the other counsel based on her sex.

For these reasons, we conclude the trial court did not violate Juarez's constitutional rights to due process and a fair trial. (See *Ramirez, supra*, 13 Cal.5th at pp. 1082–1083; *Woodruff, supra*, 5 Cal.5th at p. 772.)

### L. *Alleged Presentation of False Evidence*

Juarez contends the prosecutor knowingly presented false evidence that after leaving the Valero gas station, Juarez's van turned onto Seventh Street (where the killing occurred) when, in fact, only Angel S.'s white truck turned onto that street.

### 1. Additional Background

Pretrial, Juarez moved to preclude any police officers from "narrating what videos from [the] Valero gas station or any other surveillance video show." (Boldface & capitalization omitted.) Juarez argued that the videos speak for themselves, and the jurors can determine the matters depicted. At a pretrial hearing on the motion, Juarez's

74

defense counsel contended a police report in the case falsely stated that Juarez's van was depicted on video turning onto Seventh Street. The trial court explained that the trial witnesses could testify about their beliefs regarding the videos offered as evidence, counsel for an opposing party would be permitted to cross-examine the witnesses, and the jury would decide the facts. The court ultimately declined to rule on Juarez's in limine motion stating, "This is a trial objection for each and every question."

At trial, the prosecutor presented testimony from King City Police Department Detective Juan Rodriguez about surveillance video obtained from the Valero gas station. Detective Rodriguez testified that the video showed Angel's truck leaving the gas station and turning right onto Seventh Street. After playing a portion of the video, the prosecutor asked Detective Rodriguez if he saw on the video "the van behind -- or on Apple Street now?" Rodriguez replied, "Yes." The prosecutor next asked Rodriguez to view an exhibit; Rodriguez obliged and described the exhibit as a map depicting "[t]he path of the travel of the truck and the van after they left Valero."[36]

On cross-examination, Juarez's defense counsel asked Detective Rodriguez if he agreed that in the surveillance video, he had not seen Juarez's van turning right from Apple Avenue onto Seventh Street. Rodriguez responded, "I'd have to watch [the video] again. As far as the white truck, you can barely see it. I had to stare at it for a little bit. But I had to watch it and kind of be really close to tell you so I could see it." Upon further questioning, Rodriguez agreed that the van "disappears," "[k]ind of like the white truck did. But you could see the white truck."

Juarez's defense counsel asked Detective Rodriguez about the prosecution's map. Rodriguez seemed not to know who had generated the map or overlaid the arrows on it.

---

[36] The map depicts the location of the Valero gas station (at the corner of Apple Avenue and El Camino Real), two arrows overlaid on Apple Avenue pointing eastward (away from the gas station), a single arrow overlaid on Seventh Street pointing southward (toward the crime scene), and the location of the shooting on Seventh Street (one-half block north of Oak Avenue).

75

Rodriguez testified that the map showed the path of travel for the white truck "[a]nd also the same path of travel the green van went in." Defense counsel next confronted Rodriguez by saying, "Well, but the video doesn't show the green van on [Seventh] Street." Rodriguez responded, "Like I said, I'd have to really look into the video and maybe observe it even more." Counsel continued: "What evidence do you have that it was ever on [Seventh] Street?" Rodriguez answered, "I wouldn't be able to tell you that. I wasn't on the homicide scene. I was more of an after person that came in and started looking through the video footage." Counsel asked, "We've all looked at that video today now twice. You'd agree that us, sitting here looking at that video, we do not see that van turn on [Seventh] Street, correct?" The trial court interjected saying it was "going to sustain its own objection as to what everybody saw." The court asked Rodriguez if he would like to view the video again. Rodriguez said yes.

After replaying the video for Detective Rodriguez a couple of times, defense counsel asked, "Detective Rodriguez, now, after watching it a few times, you will agree you [] cannot see that van turning right on [Seventh] Street, correct?" Rodriguez replied, "Correct. I was trying to follow the pixilation. But it just got too pixilated for me at that point." Counsel reiterated, "We can't see it turning right on [Seventh] Street?" Rodriguez replied, "Correct."[37]

Later in the trial, the parties stipulated that a Greenfield "[c]ity video camera" positioned near the corner of Seventh Street and Oak Avenue (which is south of both Apple Avenue and the crime scene) captured the white truck driving east on Oak Avenue around the time of the shooting but did not show Juarez's van.

In closing argument, Juarez's defense counsel asserted that "Mr. Juarez was not anywhere[] near [Seventh] Street." In rebuttal argument, the prosecutor acknowledged that Juarez "took a different route" from the group in the truck (knowing they were going

---

[37] Juarez's defense counsel did not object to the admission of the map when the prosecutor subsequently moved it into evidence.

to commit the shooting) and said "[i]t doesn't matter that [Juarez] didn't turn onto [Seventh] Street, based on everything he had done."

       2.  <u>Analysis</u>

"A prosecutor's misconduct violates the Fourteenth Amendment to the federal Constitution when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] In other words, the misconduct must be 'of sufficient significance to result in the denial of the defendant's right to a fair trial.' [Citation.] A prosecutor's misconduct 'that does not render a criminal trial fundamentally unfair' violates California law 'only if it " 'involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*People v. Harrison* (2005) 35 Cal.4th 208, 242 (*Harrison*).) "Under well-established principles of due process, the prosecution cannot present evidence it knows is false and must correct any falsity of which it is aware in the evidence it presents, even if the false evidence was not intentionally submitted." (*People v. Seaton* (2001) 26 Cal.4th 598, 647.)

"When the prosecution fails to correct testimony of a prosecution witness which it knows or should know is false and misleading, reversal is required if there is any reasonable likelihood the false testimony could have affected the judgment of the jury. This standard is functionally equivalent to the 'harmless beyond a reasonable doubt' standard of *Chapman*." (*People v. Dickey* (2005) 35 Cal.4th 884, 909, italics omitted.)

The trial record does not support Juarez's assertion that the prosecutor knowingly presented or failed to correct false evidence that Juarez's van turned down Seventh Street shortly before the shooting of victim Jose. Detective Rodriguez testified on direct examination that the gas station's surveillance video showed Juarez's van traveling on Apple Avenue. Rodriguez did not testify that, on the video, he saw the van turn onto Seventh Street.

Regarding the map, Detective Rodriguez testified on direct examination that the map depicted "[t]he path of the travel of the truck and the van after they left Valero."

77

That statement is not, on its face, false. In accord with Rodriguez's brief testimony about the paths of the truck and the van as apparently shown on the video, the map includes two arrows on Apple Avenue pointing eastward (away from the gas station) and one arrow pointing southward on Seventh Street (toward the crime scene). Rodriguez did not testify explicitly on direct examination that the map represented *Juarez's van* traveling on both Apple Avenue *and* Seventh Street. Likewise, the map itself does not specifically indicate that the path displayed by the arrows reflects the path that Juarez's van, in fact, traveled on Apple Avenue and Seventh Street. Thus, we conclude the prosecutor did not commit misconduct by either presenting or failing to correct any false or misleading direct examination testimony by Detective Rodriguez about the surveillance video or the map.

Although Detective Rodriguez subsequently stated, on cross-examination, that the map depicted "the same path of travel" for both the white truck and Juarez's van (i.e., presumably including a turn onto Seventh Street), that statement was preceded by Rodriguez's equivocal testimony about the van's path as depicted in the surveillance video and his expressed desire to rewatch the video. When immediately confronted by defense counsel about the lack of proof that the van turned onto Seventh Street, Rodriguez again expressed his desire to review the video and, upon doing so, conceded that he could not see the van turning right onto Seventh Street toward the crime scene. In this context and given Rodriguez's admitted lack of knowledge about who had placed the arrows on the map, we conclude the prosecutor did not commit misconduct by failing to correct false or misleading testimony by Detective Rodriguez on cross-examination regarding the surveillance video or the map.

Regardless, assuming arguendo that the prosecutor erred by failing to interject to correct Detective Rodriguez's statement that the map depicted "the same path of travel" for both the white truck and Juarez's van, Rodriguez effectively recanted that testimony upon reexamining the surveillance video and admitting that he could not see the van turn onto Seventh Street. Further, the parties stipulated that a camera positioned a short

78

distance from the crime scene on Seventh Street did not capture Juarez's van, and the prosecutor acknowledged in his closing argument that Juarez took a different route than the truck. Under these circumstances, there is no reasonable likelihood Rodriguez's statement on cross-examination interpreting the map affected the jury's verdicts against Juarez.

M. *Ineffective Assistance of Counsel Regarding Alleged Prosecutorial Misconduct*

Juarez contends his defense counsel provided constitutionally ineffective assistance by failing to object to an inflammatory emotional appeal, misstatements of law or facts, and burden reducing, vouching arguments made by the prosecutor during closing argument. Solis joins one of Juarez's arguments which asserts a misstatement of law regarding the conspiracy to commit murder count.

1. Legal Principles

As discussed *ante* (pt. II.L.2.), a prosecutor's misconduct violates the federal Constitution "when it 'infects the trial with such unfairness as to make the conviction a denial of due process.' " (*Harrison*, *supra*, 35 Cal.4th at p. 242.) A prosecutor's misconduct further violates California law " 'if it " 'involves the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' " (*Ibid.*; see also *People v. Nadey* (2024) 16 Cal.5th 102, 184.)

"Prosecutors have wide latitude to discuss and draw inferences from the evidence at trial." (*People v. Lucas* (1995) 12 Cal.4th 415, 473.) " 'A prosecutor [also] may comment upon the credibility of witnesses based on facts contained in the record, and any reasonable inferences that can be drawn from them.' " (*Peoples*, *supra*, 62 Cal.4th at p. 796.) However, it is misconduct for a prosecutor to mischaracterize the evidence (*People v. Hill* (1998) 17 Cal.4th 800, 823), misstate the law (*id.* at p. 829), or " 'vouch for the credibility of a witness based on personal belief or by referring to evidence outside the record.' " (*Peoples*, at p. 796; see also *People v. Rodriguez* (2020) 9 Cal.5th

79

474, 480 (*Rodriguez*).) Further, " '[i]t is, of course, improper to make arguments to the jury that give it the impression that "emotion may reign over reason," and to present "irrelevant information or inflammatory rhetoric that diverts the jury's attention from its proper role, or invites an irrational, purely subjective response." ' " (*People v. Redd* (2010) 48 Cal.4th 691, 742.)

" 'A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel.' " (*People v. Centeno* (2014) 60 Cal.4th 659, 674.) However, a "mere failure to object to evidence or argument seldom establishes counsel's incompetence." (*Ghent*, *supra*, 43 Cal.3d at p. 772.)

A defendant must demonstrate deficient performance and prejudice for a claim of ineffective assistance of counsel. (*Hoyt*, *supra*, 8 Cal.5th at p. 958; *Strickland*, *supra*, 466 U.S. at p. 687.) On direct appeal, we will reverse for ineffective assistance only in limited circumstances, including that "there simply could be no satisfactory explanation" for counsel's allegedly deficient act or omission. (*Mai*, *supra*, 57 Cal.4th at p. 1009.)

"It is not sufficient to show the alleged errors may have had some conceivable effect on the trial's outcome; the defendant must demonstrate a 'reasonable probability' that absent the errors the result would have been different." (*People v. Mesa* (2006) 144 Cal.App.4th 1000, 1008 (*Mesa*).) In other words, prejudice requires a showing of "a ' "demonstrable reality," not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.)

Moreover, "the *Strickland* 'reasonable probability' standard applies to the evaluation of a Sixth Amendment claim of ineffective assistance of counsel, even when defense counsel's alleged error involves the failure to preserve the defendant's federal constitutional rights." (*Mesa*, *supra*, 144 Cal.App.4th at pp. 1008–1009; see also *Centeno*, *supra*, 60 Cal.4th at p. 676 [applying the *Strickland* prejudice standard to a

forfeited claim challenging a prosecutor's misstatements of law]; *Weaver v. Massachusetts* (2017) 582 U.S. 286, 300.)

### 2. Analysis

Juarez contends his defense counsel should have objected to the prosecutor's reference in rebuttal argument to " 'the 9/11 hijackers.' " The prosecutor made this reference in response to defense counsel's purported piecemeal discussion of "individual components" of the evidence. The prosecutor argued, "It's only when you look at everything together that you see the crime. [¶] It's much like this: Two people at airport security going through it: Innocent act, people can fly. Well, those are two of the 9/11 hijackers. You can look at something in isolation and call it innocent; but, when you look at the full picture, that's only when something becomes -- makes sense in the full picture."

We are not persuaded that there could be no satisfactory explanation for defense counsel's failure to object to the prosecutor's mention of 9/11 hijackers in the context of an otherwise proper argument that the jurors should consider all the evidence when finding the facts and deciding whether the prosecution proved guilt beyond a reasonable doubt. Defense counsel could reasonably have decided that the prosecutor's one-off reference to the 9/11 hijackers in the context of an analogy was not inflammatory, and objecting would have drawn undue attention to the prosecutor's otherwise valid argument. (Cf. *People v. Zurinaga* (2007) 148 Cal.App.4th 1248, 1259–1260.)

Juarez identifies several alleged misstatements of law or fact to which his defense counsel did not object. As to each instance identified, Juarez fails to satisfy his burden to show ineffective assistance of counsel.

Juarez contends the prosecutor misstated the law when he told the jurors in closing argument that they could consider the pretext calls in assessing Juarez's guilt. Because the statements in the pretext calls referring to Juarez were either properly admitted or their admission was harmless (see pt. II.I.3., *ante*), Juarez's defense counsel did not

81

perform deficiently in failing to make a futile objection to the prosecutor's mention of the pretext calls in argument, and there is no reasonable probability that the result of the trial would have been different had counsel objected to that mention.

Juarez contends that the prosecutor wrongly argued that the jurors could rely on the pretext calls between Angel S. and Solis as corroboration of Angel's accomplice testimony. Because there was other evidence that sufficiently corroborated Angel's testimony (see pt. II.G., *ante*), Juarez's defense counsel could reasonably have decided that the prosecutor's brief mention of "the phone calls" in the challenged portion of the argument was insignificant and, further, Juarez cannot show prejudice from his counsel's failure to object to the prosecutor's argument.

Juarez (joined by Solis) contends the prosecutor wrongly argued to the jurors that implied malice could support the conspiracy to commit murder count. For the reasons discussed *ante* (see pt. II.D.), we are not persuaded that the prosecutor's arguments regarding the conspiracy to commit murder offense misstated the law or otherwise misled the jurors into thinking that a guilty verdict for conspiracy to commit murder could be based on implied malice. Hence, Juarez's and Solis's defense counsel could reasonably have decided not to object to the prosecutor's arguments, and Juarez and Solis have failed to show any prejudicial ineffective assistance of counsel.

Juarez contends the prosecutor erroneously argued "that the jury could 'abandon' the requirement that Angel's testimony must be 'viewed with caution' because police had already done that three years earlier." Juarez's defense counsel could reasonably have decided to withhold an objection to the challenged statements because they did not clearly encourage the jurors to ignore the jury instructions about viewing accomplice statements and testimony with caution. (See *People v. Maldonado* (1999) 72 Cal.App.4th 588, 598; see also *Davis*, *supra*, 36 Cal.4th at p. 544.) Further, given that the jurors were instructed to follow the court's instructions if the "attorneys' comments on the law conflict with [the court's] instructions" and the evidence sufficiently corroborated

82

Angel's testimony regarding Juarez's guilt (see pt. II.G., *ante*), Juarez cannot show prejudice for his counsel's failure to object to the challenged statements.

To the extent Juarez contends his defense counsel was ineffective for failing to object when the prosecutor, in closing argument, "misread its own transcript" regarding segment No. 3 of the pretext calls (about " 'that guy' " having mentioned a location where people " 'were burning tires' "), that contention is unpersuasive. The record indicates that the prosecutor displayed the actual text of the pretext call when making his argument to the jury. Hence, Juarez's defense counsel could reasonably have decided that the minor difference between the prosecutor's reading and the text within the displayed portion of the transcript was not worthy of an objection, especially given that the jurors were free to review the pretext call recording and transcript during their deliberation.

Juarez contends that his defense counsel should have objected to an alleged misstatement of fact by the prosecutor when he sought (midtrial) to admit a one-page jail call log that listed calls made to one of Juarez's cell phones between November 26, 2018, and January 6, 2019. The prosecutor explained to the trial court that Juarez's primary phone (which was seized and examined by police) had a period of inactivity from November 26, 2018, to January 15, 2019. However, the jail call records showed approximately 30 calls made by "[v]arious inmates in Sureño housing" to Juarez's phone during that "gap period," which the prosecutor believed "indicates deletions" from Juarez's phone. The prosecutor asserted that when "[c]ombined with other evidence derived from the phone, the People believe that it indicates deletions of information from that device."

Juarez's defense counsel objected to the log on the grounds of lack of authentication, relevance, and speculation because the deletion of information from Juarez's phone is not a reasonable inference that can be drawn from the jail call log. When the court asked the prosecutor to reexplain the relevance of the call log, the

prosecutor said, "The relevance is that [the calls in the log are] not reflected on the phone that the People assessed that [Juarez] was using at that time, combined with other evidence of deletions. It supports that content on his phone was deleted in a period that overlaps with January 13th, 2019" (the dated of the charged crimes). The prosecutor further explained that there would be evidence that a text message between Urrutia-Flores and Juarez was found on Urrutia-Flores's phone but not on Juarez's phone. When the court asked about the relevance of "the deletions," the prosecutor answered as to the deletions of the text messages: "Deleting evidence related to his connection with participants in the crime."

The trial court decided that the call log was relevant. Defense counsel added an objection under Evidence Code section 352, which the court rejected. Upon defense counsel's further request that the call log be "sanitized" of any indication that it relates to a penal facility, the court said it needed to see the call log and would later revisit whether the log should be sanitized. Subsequently, Juarez's defense counsel stipulated to the authenticity and foundation for the call log, and the court admitted it without any reference to its jail-related origin.

Assuming arguendo that the prosecutor misstated the facts by failing to make it clear to the trial court that the call log only showed calls up to January 6, 2019 (rather than through the end of the "gap period"), given the prosecutor's reliance on other evidence of deletion of data from Juarez's phone (subsequent to January 6) to support his argument for the relevance of the log to the gap period, we conclude defense counsel could reasonably have decided that pointing out the end date for the calls on the log would not have made a difference to the trial court's ruling on the log's relevance. That is, the log covered a period that was a subset of the longer "gap period" and, as the prosecutor argued, combined with the other evidence from the phone, it supported an inference that Juarez deleted information from his phone during a continuous period that included the date of the charged crime. Further, when the log was presented to the jury,

84

the district attorney investigator testified that he had obtained "partial records" of calls placed to Juarez's phone during the gap period. For these reasons, Juarez fails to make a meritorious claim of ineffective assistance.

Juarez contends his defense counsel was ineffective for failing to object when the prosecutor argued to the jury that Juarez made a three-minute call to Solis after the murder. The record does not support Juarez's assertion of ineffective assistance of counsel. The prosecutor did not state (or even imply) that the evidence showed a three-minute call between Juarez and Solis had occurred on January 13, after the murder. The prosecutor specifically mentioned January 15 in this part of his argument—a date which accorded with the evidence proving the existence of calls between Juarez and Solis from January 15 through January 23. Juarez's defense counsel could reasonably have decided that there was no misstatement of fact by the prosecutor worthy of an objection.

Juarez identifies four unchallenged instances in which the prosecutor allegedly relied improperly "on contrived mathematical formulas, statistical probabilities, disapproved analogies, and then vouched for the correctness of [the prosecutor's] own math." (Boldface & capitalization omitted.)

Juarez contends that his defense counsel should have objected to the prosecutor's argument to the jurors that one of the reasons Angel's testimony was credible (and Juarez's was not) was because Angel got the number and brand of the beers that Juarez brought home correct, notwithstanding Juarez's testimony that Angel was looking in his truck when Juarez arrived at home and proceeded inside to put his beers in the refrigerator. The prosecutor asserted the "odds" of Angel's correct testimony about the beers (under a math formula he displayed) were "kind of astronomical."

Although courts have cautioned against reducing the definition of the beyond a reasonable doubt standard to a quantitative measure (see *People v. Medina* (1995) 11 Cal.4th 694, 744–745; *People v. Katzenberger* (2009) 178 Cal.App.4th 1260, 1267–1268; see also *People v. Collins* (1968) 68 Cal.2d 319, 332), the prosecutor's argument in the

instant case did not reference the burden of proof or urge the jury to reach its verdict based on probabilities. Further, defense counsel subsequently responded to the prosecutor's argument by asserting that the postcrime "beer celebration" was not corroborated, and Angel in fact saw the beers in Juarez's arms when he got home. Given these circumstances, we conclude that defense counsel could reasonably have decided that the prosecutor's reference to the "astronomical" odds of Angel's testimony about the Mickey's beers made little difference to the jury's determination of his credibility and thus was not worthy of objection.

During cross-examination of Juarez, the prosecutor showed Juarez three Google Maps with driving times printed on them for trips within King City or between King City and Greenfield. The prosecutor asked Juarez about those driving times, and Juarez either agreed with the driving time stated on the map or provided his own estimate for the identified trips. The prosecutor subsequently moved the maps into evidence without any defense objection.[38]

In closing argument, the prosecutor used the maps, Juarez's testimony, and other evidence (including surveillance videos) to propose a timeline of events and asserted that there was a 17- to 24-minute gap between the time Juarez arrived in Greenfield to the time he was spotted at the Valero gas station. The prosecutor argued that during this time Juarez was driving around Greenfield looking for the potential targets he later discussed with the group in the truck at the Valero.

Juarez contends that because "no witness testified to the foundation for the Google maps" and the prosecutor said he was being " 'fair' " with his estimates for the timeline, the prosecutor committed misconduct by relying on the maps in his argument and vouching for his own fairness in stating the time estimates.

---

[38] Juarez makes no argument that his defense counsel was constitutionally ineffective for failing to object to the prosecutor's use of the Google Maps when cross-examining Juarez or the admission of the Google Maps into evidence.

Juarez's contentions lack merit.  On this record, Juarez's defense counsel could reasonably have decided that there was no ground to object to the prosecutor's use of admitted exhibits (which Juarez himself had addressed in his testimony) to build a timeline for the jury's consideration.  Further, we discern no improper vouching in the prosecutor's argument about the timeline.  The prosecutor's statements about him being fair with his estimates included statements about giving the jurors "the range to decide" what the evidence proves and "to explain and consider everything."  None of the prosecutor's statements suggests that evidence not available to the jury supports the prosecutor's argument or invokes the prosecutor's personal prestige or that of the district attorney's office.  (See *Rodriguez*, *supra*, 9 Cal.5th at p. 480.)

In his rebuttal argument, the prosecutor used an image of a mosaic of a panda to assert that Juarez's defense counsel had offered innocent explanations for individual acts in her closing argument, but the jurors should look at the totality of the evidence (i.e., "the full picture" rather than "isolated tiles") to decide the question of guilt.

Juarez contends the prosecutor committed misconduct "by using a mosaic as a short-cut substitution for proof beyond a reasonable doubt," and defense counsel rendered ineffective assistance by not objecting to that use of the mosaic.

We are not convinced that there could be no satisfactory explanation for defense counsel's failure to object to the prosecutor's use of the panda mosaic.  The prosecutor's reliance on the mosaic did not undermine or lessen the prosecution's burden of proof.  Rather, it illustrated that the jurors should consider all the evidence in deciding the case.  (See *People v. Manson* (1977) 71 Cal.App.3d 1, 36 ["Just as an artist creates a mosaic a piece at a time, so a prosecutor creates a picture of guilt by consideration of individual bits of evidence, otherwise insignificant, which in totality convince the seeker of truth."].)

Finally, as mentioned *ante* (see pt. II.F.), the prosecutor elicited testimony from Detective Partida on redirect examination about the active rivalry between King City's Norteño and Sureño gangs in 2017–2019.  When asked by the prosecutor to explain how

87

the rivalry was "active," Partida testified to his belief that in "2017 there [were] approximately 30 shootings in King City that were mainly -- I would say 80 to 90 percent connected to gang-related shootings." This testimony followed defense counsel's cross-examination of Partida about a "peace treaty currently [] in effect in our prison system" between the Mexican Mafia and Nuestra Familia. Additionally, while testifying on direct examination about his qualifications as a gang expert, the prosecutor asked Partida, "What percentage of the gang crimes that you investigate has involved crimes where the suspects are Sureño gang members?" Partida replied, "Almost all of them."

Juarez contends the prosecutor committed misconduct by eliciting the above-described testimony, and his defense counsel was constitutionally ineffective for failing to object to that testimony. Juarez argues that the prosecutor engaged a "misuse of math" and "relied on statistics to induce fear and suggest guilt by association."

Juarez's assertions are not persuasive. Contrary to the suggestion in Juarez's appellate briefing, Detective Partida did not testify that in 2017, "the 'percentage' " of gang-related shooting crimes in King City "committed by Sure[ñ]os was 'almost all of them.' " Further, Juarez offers no valid basis for an objection to the actual question and answer stated by the prosecutor and Partida on direct examination regarding Partida's experience investigating gang crimes. Similarly, Juarez does not offer any persuasive argument that there could be no satisfactory explanation for defense counsel's failure to object to Partida's redirect examination testimony about the nature of the active rivalry between King City's Norteño and Sureño gangs in 2017–2019. Counsel could reasonably have decided that that testimony was a proper response to her cross-examination of Partida and any objection would have been futile.

N. *Cumulative Error*

Juarez and Solis contend the cumulative effect of prejudice from their claimed errors require reversal.

88

Having concluded *ante* that Solis's claims of error are without merit, we in turn reject his claim of cumulative prejudice resulting from the asserted errors. There is no prejudicial error to cumulate. (See *People v. Hensley* (2014) 59 Cal.4th 788, 818.)

We similarly reject Juarez's claim of cumulative error and prejudice. " 'The "litmus test" for cumulative error "is whether defendant received due process and a fair trial." ' " (*People v. Poletti* (2015) 240 Cal.App.4th 1191, 1217.) Although we assumed error regarding the trial court's failure to explain the concept of causation for murder more fully (see pt. II.C.2., *ante*) and admission of two segments of the pretext calls (segment Nos. 7 & 8) (see pt. II.I.3., *ante*), considering the reasons explained for the lack of prejudice as to each claim of error, we determine that these independent errors do not compound to create prejudicial error or a miscarriage of justice. (*Ibid*.)

O. *Correction to Solis's Abstract of Judgment*

Although not raised by either Solis or the Attorney General, the abstract of judgment (dated Oct. 28, 2022) for Solis's indeterminate commitment contains an error. That abstract of judgment incorrectly states that Solis was convicted on count 4 of "Criminal Gang Activity" under section "182.5" and that the sentence on that count was imposed consecutive. In fact, Solis was convicted of *conspiracy to commit murder* on count 4, under *section 182, subdivision (a)(1)*, and the trial court imposed a concurrent sentence of 25 years to life on that count. Although we affirm the judgment against Solis, we direct the trial court to prepare a new abstract of judgment for Solis's indeterminate commitment that properly reflects the crime of conviction and sentence imposed on count 4.

## III. DISPOSITION

The judgment against Juarez is affirmed. The judgment against Solis is affirmed. The trial court is directed to prepare a new abstract of judgment for Solis to indicate that Solis was convicted of conspiracy to commit first degree murder on count 4, under Penal Code section 182, subdivision (a)(1), and sentenced to 25 years to life for that conviction,

89

concurrent to count 1. The trial court clerk is directed to forward a copy of the corrected abstract of judgment to the California Department of Corrections and Rehabilitation.

_____

                                         Danner, J.

WE CONCUR:

_____

Greenwood, P. J.

_____

Bromberg, J.

**H050476 -** *People v. Juarez*
**H050556 -** *People v. Solis*